1  Hart L. Robinovitch (AZ #020910)
   Ryan J. Ellersick (*Pro Hac Vice forthcoming*)
2  ZIMMERMAN REED LLP
   14648 N. Scottsdale Road, Suite 130
3  Scottsdale, AZ 85254
   Telephone: (480) 348-6400
4  Fax: (480) 348-6415
   hart.robinovitch@zimmreed.com
5  ryan.ellersick@zimmreed.com

6  *Attorneys for Plaintiffs*

7

**UNITED STATES DISTRICT COURT**

8

**DISTRICT OF ARIZONA**

9

| | |
|---|---|
| George Williams, Brad Williams, Sean Daughtery, and Margaret Milford, individually, and on behalf of those similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | Jury Trial Demanded |
| TMC Health, | |
| Defendant. | |

16

17

18

19

20

21

22

23

24

25

26

27

28

1

Plaintiffs George Williams, Brad Williams, Sean Daughtery, and Margaret Milford ("Plaintiffs"), on behalf of themselves and all others similarly situated, file this Class Action Complaint against Defendant TMC Health, and in support state the following:

## INTRODUCTION

1.      This case is about Defendant TMC Health's secret and unauthorized disclosure of its patients' sensitive health information to third parties through various online tracking technologies.  TMC Health is one of the largest health systems in Southern Arizona, serving a population of over one million residents through its flagship hospital, Tucson Medical Center; multiple primary and specialty-care clinics; and several regional hospitals.   TMC Health also operates a website, www.tmcaz.com, (the "Website"), where it allows existing and prospective patients to search for doctors, research conditions and symptoms, and sign up for classes and events related to sensitive healthcare topics, such as "Preparation for Childbirth" and "Mental Health Resiliency."

2.      Unbeknownst to its patients and prospective patients visiting the Website, TMC Health procures third-party technology companies to secretly intercept and record the visitors' activities on the Website in real-time, including specific searches for sensitive health-related topics. TMC Health does this in order to obtain valuable personal data about visitors to its Website. TMC Health then uses this valuable data to increase its own profits through sophisticated and targeted advertising. This case seeks to end TMC Health's serious and ongoing breach of its patients' sensitive health data and make those patients whole under federal and state privacy laws.

3.      Plaintiffs bring this class action complaint on behalf of a class of persons impacted by Defendant's secret and unauthorized disclosure of their highly sensitive Personal Health Information ("PHI") and Personally Identifiable Information ("PII") (collectively "Sensitive Information") to third parties.

4.      Defendant solicited and obtained Plaintiffs' and the Class's Sensitive Information in connection with its services as a healthcare provider. In operating the Website as part of its healthcare activities, Defendant promised its patients that their Sensitive Information was

private and secure and would never be disclosed for "marketing purposes" absent written authorization.[1] Despite these representations and promises, Defendant allowed third parties to secretly intercept and record its patients' Sensitive Information for "marketing purposes" through various online tracking technologies.  Defendant intentionally omitted reference to the online tracking technologies in its Privacy Policy and the Website. In turn, there could be no consent by Plaintiffs or the Class Members to such practices.

5.     In June 2022, nonprofit newsroom The Markup published a story about healthcare providers, like Defendant, that were secretly disclosing sensitive health information to Facebook through an online tracking tool.  According to The Markup's report, "A tracking tool installed on many hospitals' websites has been collecting patients' sensitive health information—including details about their medical conditions, prescriptions, and doctor's appointments—and sending it to Facebook."[2]

6.     Like the healthcare providers referenced in The Markup's report, Defendant incorporates Meta Platform, Inc.'s ("Meta") tracking technology, the Meta Pixel ("Pixel"), on the Website.  Pixel is a snippet of code that, when embedded on a third-party website, tracks the website visitor's activity on that website and sends that data to Meta.  Pixel tracks mouse clicks, words typed into search bars, and pages visited on the website, all of which in many cases include sensitive personal and identifying information that is not anonymized.  Indeed, Pixel is routinely used to target specific customers by utilizing the data gathered to build profiles for the purpose of future targeting and marketing.  Here, the information transmitted to third-party Meta, without Plaintiffs' consent, included private healthcare information (including but not limited to searches for specific medical conditions, treatments and/or providers), which is some of the most personal and sensitive data Plaintiffs possess.

7.     But Defendant's conduct is worse.  In addition to deploying the Meta Pixel on the

---

[1]     https://www.tmcaz.com/notice-of-privacy-practices

[2]     *Facebook Is Receiving Sensitive Medical Information from Hospital Websites* (June 16, 2022) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited Aug. 31, 2023).

Website, Defendant incorporates tracking technologies from at least two other popular social media companies: LinkedIn and Snapchat.  Like the Meta Pixel, the LinkedIn and Snapchat tracking code intercepts and records mouse clicks, words typed into search bars, and pages visited on the Website—including searches for specific conditions, treatments, and doctors—and transmits that Sensitive Information to LinkedIn and Snapchat.  Like Meta, LinkedIn and Snapchat then match those communications with unique identifiers to associate the Website visitor to their LinkedIn or Snapchat accounts.

8.    Finally, Defendant uses another tracking technology on its website to track the webpages visited by every user in order to link that web activity with potential subsequent phone calls to the Defendant placed by the user.  On information and belief, Defendant procured the services of CallRail, Inc., to deploy the webpage tracking code on Defendant's Website.

9.    Defendant's use of online tracking technologies from Meta, LinkedIn, Snapchat, CallRail, and potentially other third parties (collectively, "tracking technologies"), allowed for a broad scope of patient information, including highly confidential medical information, to be collected and transmitted to third parties without patients' knowledge or consent.

10.    In July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about the use of online tracking technologies that could result in unauthorized disclosures of Sensitive Information to third parties.[3]  The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others."[4]  According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical

---

[3]    https://www.ftc.gov/business-guidance/blog/2023/07/ftc-hhs-joint-letter-gets-heart-risks-tracking-technologies-pose-personal-health-information

[4]    https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[5]

11.    In December 2022, the U.S. Department of Health and Human Services Office for Civil Rights ("OCR") warned healthcare providers that, "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."[6]    The OCR's guidance also made clear that, "disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."

12.    Despite these warnings from federal regulators and the clear terms of Defendant's own Privacy Policy, Defendant TMC Health has and continues to deploy tracking technologies that result in unauthorized disclosures of its patients' Sensitive Information.  Defendant uses these tracking technologies to maliciously collect data from its patients in a manner that allows Defendant to subvert federally required consent.   Defendant later uses the data collected from the tracking technologies to improve and save costs on its marketing campaigns.  Defendant also uses these technologies to improve its data analytics and increase revenue by, among other things, attracting new patients. Once Defendant has the data, however, it may use it for any purpose, including to sell on the personal-data market.

13.    As a healthcare provider, Defendant has a duty to maintain the security and privacy of its patients' and prospective patients' Sensitive Information and prevent unauthorized disclosure of that information to third-party technology companies like Meta, LinkedIn, Snapchat, and CallRail.  As a result of Defendant's use of tracking technologies on the Website, Plaintiffs' and the Class's Sensitive Information—including unique identifiers; information about patients' health care providers; types of treatments or conditions researched; patient status; and other sensitive health-related information submitted by Plaintiffs and the Class on

---

[5]    *Id.*

[6]    https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

Defendant's Website—was compromised and disclosed to third parties without authorization or consent.  Defendant's unauthorized disclosure constituted a serious breach of its duties and obligations to maintain the security and privacy of its patients' and prospective patients' Sensitive Information.

14.    Defendant's disclosure of Sensitive Information allowed third parties to know that a specific patient was seeking confidential medical care or being treated for a specific condition.

15.    Plaintiffs and the Class never consented to, authorized, or otherwise agreed to allow Defendant to disclose their Sensitive Information to anyone other than those reasonably believed to be part of TMC Health, acting in some healthcare capacity.

16.    As a direct and proximate result of Defendant's unauthorized disclosure of Plaintiffs' and the Class's Sensitive Information, Plaintiffs and the Class Members have suffered injury and harm, including invasions of privacy; loss of their personal information; loss of the benefit of the bargain Plaintiffs and the Class considered at the time they bargained for medical services and agreed to use Defendant's Website; statutory damages; and the continued and ongoing substantial risk of their Sensitive Information being exposed to third parties.

17.    Plaintiffs and the Class bring this action to recover for the harm they suffered and assert the following claims: violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511; violations of the Arizona Consumer Fraud Act ("ACFA"), A.R.S. §44-1521, *et seq.*; Negligence; Invasion of Privacy; Breach of Implied Contract; and Unjust Enrichment.

**JURISDICTION AND VENUE**

18.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the Complaint asserts claims pursuant to Defendant's violations of ECPA, 18 U.S.C. § 2511.  The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

19.    This Court has personal jurisdiction over this action because Plaintiffs are residents and citizens of the State of Arizona who received health care from Defendant and

visited Defendant's Website while in the State of Arizona.  Defendant is an Arizona nonprofit corporation with its principal office located at 5301 E. Grant Road, Tucson, Arizona 85712.

20.    Venue is proper in this Court because Defendant's headquarters is located within the District, and Plaintiffs' claims arise from Defendant's conduct in this District.

### PARTIES

21.    **Plaintiff** George Williams is a natural person domiciled in the State of Arizona. At all relevant times, he resided in Tucson, Arizona.  For the last several years, and most recently in 2023, he visited the Defendant's Website while in Arizona to conduct searches for his symptoms/conditions and possible treatments, to search for his current or prospective doctors, and to schedule his appointments.  He also used the patient portal on the Defendant's Website to review his test results.[7]   At all relevant times, Plaintiff G. Williams had accounts with Facebook, Instagram,[8] LinkedIn, and Snapchat, and stayed logged-in to his accounts when browsing the internet.

22.    **Plaintiff** Brad Williams is a natural person domiciled in the State of Arizona.  At all relevant times, he resided in Tucson, AZ.  For several years, and most recently in early 2023, he visited the Defendant's Website while in Arizona to search for his current or prospective doctors, including by typing information into the Website's "search" bar. He also used the patient portal on the Defendant's Website to schedule his appointments, pay his bills, and search for his current or prospective doctors. At all relevant times, Plaintiff B. Williams had a Facebook account and stayed logged-in to his account when browsing the internet.

23.    **Plaintiff** Sean Daugherty is a natural person domiciled in the State of Arizona.  At all relevant times, he resided in Tucson, AZ.  In 2021 and 2022, he visited the Defendant's Website while in Arizona to search for his current or prospective doctors, including by typing information into the Website's "search" bar. Plaintiff Daughtery also searched for information

---

[7]    Further details regarding any Plaintiffs' medical conditions and prospective or actual medical treatments entered or searched on Defendant's website are not required to be pled under Fed. R. Civ. P. 8, and doing so would require Plaintiffs to publicly disclose private and sensitive medical data, compounding Defendant's violation of their medical privacy.

[8]    Instagram, another social media company, is owned by Meta.

about symptoms/conditions and possible treatments for himself and family members. In addition, he used the patient portal on the Defendant's Website to review and obtain his medical records. At all relevant times, Plaintiff Daughtery had Facebook and LinkedIn accounts and stayed logged-in to his accounts when browsing the internet.

24.     **Plaintiff** Margaret Milford is a natural person domiciled in the State of Arizona. At all relevant times, she resided in Tucson, AZ.  For the last several years, and most recently in August 2023, she visited the Defendant's Website while in Arizona to search for information about her conditions/symptoms and possible treatments, including by typing information into the Website's "search" bar. Plaintiff Milford also used the patient portal on the Defendant's Website to check her lab results, review her doctors' messages, and obtain other medical information related to her healthcare from TMC Health. At all relevant times, Plaintiff Milford had Facebook and Snapchat accounts and stayed logged-in to her accounts when browsing the internet.

25.     Plaintiffs reasonably expected that their online communications with Defendant were between them and Defendant, would remain private, and would not be shared with third parties without their consent.

26.     After using Defendant's website, some Plaintiffs recall receiving health-related ads on Facebook, Instagram, LinkedIn, and Snapchat.

27.     **Defendant** is an Arizona nonprofit corporation with its principal place of business in Tucson, Arizona.  TMC Health is the corporate entity that includes Tucson Medical Center; TMCOne primary and specialty care practices; and numerous other inpatient and outpatient facilities.[9]

## FACTUAL BACKGROUND

### A.     Defendant Collected, Maintained, and Stored Sensitive Information

---

[9]     These include: Peppi's House – TMC Hospice, TMC Integrative Pain Clinic, and TMC Wound Care Center; TMC Medical Network and TMCOne, including all ambulatory primary and specialty care clinics, TMC Urgent Care – Rincon, and TMC Urgent Care – Wyatt; Benson Hospital, including Benson Hospital Rehabilitation, Benson Family Health Care Clinic, Benson San Pedro Clinic, and Vail Valley Family HealthCare; Northern Cochise Community Hospital, including Sulphur Springs Medical Center and Sunsites Medical Clinic. *See* https://www.tmcaz.com/notice-of-privacy-practices.

28.    To obtain healthcare services, patients and prospective patients, like Plaintiffs and the Class, must provide Defendant with highly sensitive information, including PII, PHI, or both. Defendant compiles, stores, and maintains the highly sensitive PII and PHI and, often, through the provision of its services, creates records containing additionally highly sensitive data concerning patients' medical diagnostics, treatment, and other personal information documented by medical providers.  Defendant serves a population of approximately one million residents, meaning it has created and maintains a massive repository of Sensitive Information.

29.    Defendant tells patients it will keep their Sensitive Information secure and private. Indeed, Defendant maintains a Notice of Privacy Practices on its Website that states, "TMC Health is required by law to maintain the privacy of PHI."[10]  According to the Notice of Privacy Practices, this requirement comes from "[t]he Health Insurance Portability and Accountability Act (HIPAA)," which, "establishes national standards to protect individuals' medical records and other personal health information."[11] The Notice also provides that TMC Health will notify patients about a breach of their Sensitive Information: "TMC Health is required by law to provide notification to affected individuals or their representatives and to the [Office for Civil Rights] for [Health and Human Services] following the discovery of a breach of unsecured PHI."[12]

30.    Importantly, Defendant also promises its patients and prospective patients who visit its Website: "TMC Health will obtain your authorization to use or disclose your PHI in the following circumstances: . . . disclosures for marketing purposes."[13]

31.    The Notice of Privacy Practices does not mention Defendant's use of the tracking technologies on its Website. Nor does Defendant mention its use of the tracking technologies on other parts of its Website.  Defendant does not disclose that Meta and/or other particular third parties may intercept, obtain and/or use patients' private information for the third-parties'

---

[10]    https://www.tmcaz.com/notice-of-privacy-practices

[11]    *Id.*

[12]    *Id.*

[13]    *Id.*

benefit. On information and belief, Defendant omits this material information in all interactions with its patients and prospective patients.

32.    Plaintiffs and the Class had a reasonable expectation of privacy and relied on Defendant to protect their Sensitive Information.  Defendant knew or should have known that failing to adequately protect patient information could cause substantial harm.  Moreover, through its Notice of Privacy Practices, Defendant acknowledged its obligation to reasonably safeguard Sensitive Information against unauthorized disclosure to third parties.

33.    As described throughout this Complaint, Defendant did not reasonably protect, secure, or store Plaintiffs' and the Class's Sensitive Information, but rather intentionally and knowingly granted third-party technology companies access to that information in violation of federal and state law, as well as its stated practices and agreements with Plaintiffs and the Class.

34.    As a direct and proximate result of Defendant's actions, third parties obtained access to and collected confidential patient data without the patients' authorization, resulting in a significant invasion of patient privacy and breach of sensitive data.

**B.    Defendant Exposed Its Patients' Sensitive Information**

35.    Defendant implements several tracking technologies on its Website that intercept, record, and transmit its patients' and prospective patients' Sensitive Information to third parties for marketing and advertising purposes.  The tracking technologies include: the Meta Pixel, the LinkedIn Insight Tag, the Snap Pixel, and CallRail's web-tracking code.

36.    Defendant could have configured its Website not to communicate or share any information with third parties, or to limit the information it communicated to third parties while maintaining the necessary security and confidentiality of Sensitive Information, but it did not.

37.    Upon information and belief, Defendant intercepted and disclosed, and procured multiple third parties like Meta to intercept, the following Sensitive Information of its patients and prospective patients through the use of the tracking technologies: (1) Plaintiffs' and the Class Members' status as medical patients, or alternatively, Plaintiffs' and the Class Members' consideration of becoming a medical patient of Defendant; (2) Plaintiffs' and the Class Members' communications with Defendant on the Website; (3) Plaintiffs' and the Class

Members' searches for treatment locations, specific medical providers, and particular medical conditions and treatments; (4) PII, including but not limited to patients' locations, IP address, device identifier, cookies used to identify specific users, and/or individuals' unique account identifiers. In short, Defendant intercepted and procured third-party technology companies to intercept Plaintiffs' and the Class Members' activity on the Website and personal identifying information to link specific users to their activity on the Website. The Sensitive Information disclosed by Defendant constituted actual content that revealed patients' medical conditions/symptoms, specific search queries, searches for particular doctors, searches for treatments, and/or other Sensitive Information.

38.     Despite the highly sensitive nature of the information Defendant obtained, created, and stored, Defendant inexplicably failed to take appropriate steps to protect the privacy of the PII and PHI of Plaintiffs and the Class, and instead intentionally employed the tracking technologies to willingly disclose patient data to third parties.

39.     Defendant deprived Plaintiffs and the Class Members of their privacy rights when it: (a) implemented the tracking technologies that surreptitiously tracked, recorded, and disclosed Plaintiffs' and the Class Members' confidential communications and private information; (b) disclosed Plaintiffs' and the Class Members' protected information to unauthorized third parties; and (c) failed to provide notice to Plaintiffs and the Class Members about the breach or obtain their consent to share their Sensitive Information with others.

**C.     The Meta Pixel**

40.     Meta's, f/k/a Facebook, core business function is to sell advertising, and it does so on several platforms, including Facebook and Instagram. The bulk of Meta's billions of dollars in annual revenue comes from advertising—a practice in which Meta actively participates through the use of algorithms that connect ads to specific users.

41.     Over the last decade, Meta has become one of the largest and fastest growing online advertisers in the world. Since its creation in 2004, Meta's daily, monthly, and annual user base has grown exponentially to billions of users.

11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

42.     Meta's advertising business has been successful due, in significant part, to Meta's ability to target consumers, both based on information users provide to Meta and other information about users Meta extracts from the internet at large.  Given the highly specific data used to target particular users, thousands of companies and individuals utilize Meta's advertising services.

43.     One of Meta's most powerful advertising tools is the Meta Pixel (formerly the Facebook Pixel), which it first launched in 2015.

44.     Meta branded Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."  Meta further stated:

> Facebook pixel, [is] a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website.  We're also announcing the availability of custom conversions, a new rule-based method to track and report conversions for your Facebook ads.

> Facebook pixel makes things simple for advertisers by combining the functionality of the Conversion Tracking pixels and Custom Audience pixels into a single pixel.  You only need to place a single pixel across your entire website to report and optimize for conversions.  Since it is built on top of the upgraded Custom Audience pixel, all the features announced in our previous blog post (Announcing Upgrades to Conversion Tracking and Optimization at Facebook) are supported through Facebook pixel as well.

> [Advertisers and website operators] can use Facebook pixel to track and optimize for conversions by adding standard events (e.g., Purchase) to your Facebook pixel base code on appropriate pages (e.g., purchase confirmation page).[14]

45.     Pixel is a publicly available piece of code that Meta makes available to web developers for free.  Website developers can choose to install and use Pixel on their websites to track and measure certain actions by website visitors.  When a website visitor takes an action a developer chooses to track on their website, the Pixel is triggered and sends data about that "Event" to Meta.  All of this happens without the user's knowledge or consent.

46.     Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet.  Each

---

[14]     Cecile Ho, Announcing Facebook Pixel, Meta (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

"client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

47.    Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

48.    Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

    a.    HTTP Request: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies. POST Requests can send a large amount of data outside of the URL (for instance, uploading a PDF for filing a motion to a court).

    b.    Cookies: a small text file that can be used to store information on the client device that can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

    c.    HTTP Response: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

49.    An individual's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as the "Doctors" page). The HTTP Response sends the requested information in the form of "Markup." This is the foundation for the pages, images,

words, buttons, and other features that appear on the individual's screen as they navigate Defendant's Website.

50.     Every website is composed of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

51.     Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.  Defendant embedded Pixel in its source code for that very purpose.

52.     By secretly recording and transmitting data to Meta—without the user's knowledge or consent—Pixel acts much like a traditional wiretap controlled by Defendant. When individuals visit TMC Health's website via an HTTP Request to Defendant's server, the server sends an HTTP Response including the Markup that displays the webpage visible to the user along with the invisible Source Code that includes the Pixel.  At that point, Defendant, in essence, hands individuals visiting its Website a tapped device. Once the webpage is loaded into the individual's browser, Pixel quietly waits for private user communications on the webpage to trigger the code-based wiretap.  Pixel then intercepts those communications intended only for Defendant and transmits the communications to Meta.

53.     The data intercepted by Pixel is also linked to a specific IP address,[15] which Meta may use in combination with other cookies and tracking technologies to associate the web activity to a specific Facebook user.[16]

54.     Meta does this by placing cookies in the web browsers of users logged into their services. The "c_user" cookie, for example, contains a numerical value known as the Facebook ID, which uniquely identifies a Facebook user.  When a Facebook user visits the Defendant's Website while logged-in to their Facebook account, Pixel transmits the user's private web

---

[15]     https://developers.facebook.com/docs/meta-pixel

[16]     https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites ("The Meta Pixel sends information to Facebook via scripts running in a person's internet browser, so each data packet comes labeled with an IP address that can be used in combination with other data to identify an individual or household.").

communications with the Defendant along with the "c_user" cookie. Meta can then use this information to match the web communications with the user's Facebook ID.

55.     Even if a user does not have a Facebook account or is not logged-in to Facebook when browsing the Defendant's Website, Pixel transmits the user's web communications with Defendant's Website to Meta along with a unique identifier associated with another cookie called the "_fbp" cookie. Meta can then use that unique identifier, along with other persistent cookies, to link the user's web communications with the user's Facebook ID. And if a user who does not have a Facebook account later creates an account, Meta may be able to associate the user's historical browsing history intercepted via the Pixel and "_fbp" cookie to the newly created account.

56.     Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its Source Code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to Meta. Meta then uses the information transmitted by Pixel to match the user with their Facebook ID.

57.     Judge William H. Orrick on the U.S. District Court for the Northern District of California recently summarized how this process plays out:

> To understand how the Meta Pixel typically works, imagine the following scenario. A shoe company wishes to gather certain information on customers and potential customers who visit its website. The shoe company first agrees to Meta's Business Tools Terms (discussed below), which govern the use of data from the Pixel. The shoe company then customizes the Meta Pixel to track, say, every time a site visitor clicks on the "sale" button on its website, which is called an "Event." Every time a user accesses the website and clicks on the "sale" button (i.e., an "Event" occurs), it triggers the Meta Pixel, which then sends certain data to Meta. Meta will attempt to match the customer data that it receives to Meta users—Meta cannot match non-Meta users. The shoe company may then choose to create "Custom Audiences" (i.e., all of the customers and potential customers who clicked on the "sale" button) who will receive targeted ads on Facebook, Instagram, and publishers within Meta's Audience Network. Meta may also provide the shoe company with de-identified, aggregated information so the shoe company understands the impact of its ads by measuring what happens when people see them. Meta does not reveal the identity of the matched Meta users to the shoe company.

*In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *2 (N.D.

Cal. Dec. 22, 2022) (internal citations omitted).[17]

58.    It is one thing for a retail business to use Pixel to track web activity in the regular course of commercial activity.  But in this case, Defendant, a healthcare provider, employed Pixel to intercept, duplicate, and re-direct Plaintiffs' and Class Members' sensitive health information to Meta.

59.    The following is an example of how Pixel works on Defendant's Website. When an individual visits https://www.tmcaz.com and navigates to the "symptoms" page, the user can select a wide variety of symptoms related to sensitive medical conditions, including "unexplained weight loss."  Clicking on the "unexplained weight loss" option takes the user to the following webpage:



60.    Because Defendant's Website has the Pixel embedded, the user's activity visiting the "unexplained weight loss" webpage is intercepted and transmitted to Facebook along with (1) the "c_user" cookie that identifies the user based on their unique Facebook ID, and/or (2)

---

[17]    In describing Pixel technology in *In re Meta Pixel Healthcare Litig.*, the court referenced the declaration of expert Richard M. Smith, which provides further details on the manner in which the challenged Pixel technology works and Meta's arrangements with health providers that employ it. 2022 WL 17869218, at *2.  *See* Declaration of Richard M. Smith, filed in *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO (N.D. Cal.) [ECF 49].

the unique identifier associated with the "_fbp" cookie that, in the event the user is not logged-in to Facebook, Meta can use to match with the user's actual Facebook ID.

61.    Plaintiffs and the Class Members never consented, authorized, or otherwise permitted Defendant to disclose their personally identifiable and protected health information to Meta.  Plaintiffs were not provided with any prior written notice that Defendant disclosed their Sensitive Information, nor were they provided any means of opting out of such disclosures. Even so, Defendant knowingly and intentionally disclosed Plaintiffs' and the Class Members' protected and private information via the Meta Pixel.

**D.    LinkedIn Insight Tag**

62.    LinkedIn is the largest social media platform geared specifically to professionals. LinkedIn boasts a membership of approximately 980 million users in more than 200 countries and territories worldwide.[18]  Its mission is to "connect the world's professionals to make them more productive and successful."[19]  Microsoft acquired LinkedIn in 2016 for $26.2 billion.[20]

63.    Like Meta, LinkedIn generates substantial revenue through its advertising program, bringing in more than $3 billion in revenue in 2021.[21]  For companies looking to advertise, LinkedIn pitches its ability to "[r]each the right audience," through "[p]recise and powerful audience targeting."[22]  This allows companies and advertisers to "[t]arget [their] ideal customer based on traits like their job title, company name or industry, and by professional or personal interests."[23]

---

[18]    https://about.linkedin.com/?trk=homepage-basic_directory_aboutUrl

[19]    *Id.*

[20]    https://www.nytimes.com/2016/06/14/business/dealbook/microsoft-to-buy-linkedin-for-26-2-billion.html

[21]    https://www.cnbc.com/2021/04/27/microsoft-linkedin-topped-3-billion-in-ad-revenue-in-last-year.html

[22]    https://business.linkedin.com/marketing-solutions/ad-targeting

[23]    *Id.*

64.     Like Meta, LinkedIn's ability to provide advertisers with precise target audiences comes from information users provide to LinkedIn as well as information LinkedIn learns about its users using online tracking technology.

65.     One of LinkedIn's online tracking tools is the LinkedIn Insight Tag. According to LinkedIn, "[t]he LinkedIn Insight Tag is a piece of lightweight JavaScript code that [companies] can add to [their] website to enable in-depth campaign reporting and unlock valuable insights about [their] website visitors."[24]   The LinkedIn Insight Tag can be used to "track conversions, retarget website visitors, and unlock additional insights about members interacting with [] ads."[25]

66.     Like the Meta Pixel, the LinkedIn Insight Tag "enables the collection of data regarding members' visits to [a] website, including the URL, referrer, IP address, device and browser characteristics (User Agent), and timestamp."[26]   The LinkedIn Insight Tag also transmits various cookies and unique identifiers to LinkedIn that allow LinkedIn to match the user's activity on the website to the user's LinkedIn account.[27]   And if the user does not have a LinkedIn account, the data still includes unique identifiers, such as the user's IP address and device and browser characteristics.[28]

67.     The following are examples of how the LinkedIn Insight Tag is used to collect Sensitive Information on Defendant's Website. If a user types the word "depression" into the "search" bar on Defendant's Website, the following page is displayed:

---

[24]     https://www.linkedin.com/help/lms/answer/a427660

[25]     *What data does my website send through this tag and how is it used?* https://www.linkedin.com/help/lms/answer/a427660

[26]     *Id.*

[27]     *See id.*

[28]     *See id.*



68.    Because Defendant uses the LinkedIn Insight Tag on its Website, this information is intercepted, recorded, and transmitted to LinkedIn, along with several cookies that LinkedIn can use to identify the specific user based on their LinkedIn account:

69.    The "path" reflects the URL information that is transmitted to LinkedIn, including that the user searched for the word, "depression."   LinkedIn also receives a cookie called "UserMatchHistory," which, according to LinkedIn's website, is used for "LinkedIn Ads ID

syncing."[29]    The LinkedIn Insight Tag also transmits two other cookies, "lms_ads" and "lms_analytics," which are used "to identify LinkedIn Members off LinkedIn for advertising," and "to identify LinkedIn Members off LinkedIn for analytics," respectively.[30]    Using this information, LinkedIn is able to associate the user's search for "depression" with the user's specific LinkedIn account for purposes of future targeted advertising.

70.    As another example, if a user of Defendant's Website navigates to the "Find a Provider" page and searches for doctors based on the specialty of "Psychiatry," the Website displays the following page:



71.    Unbeknownst to the user of Defendant's Website, the LinkedIn Insight Tag intercepts, record, and transmits the same information to LinkedIn, along with unique identifiers that LinkedIn can use to match the user activity to a specific LinkedIn account:

---

[29]    https://www.linkedin.com/legal/l/cookie-table

[30]    *Id.*



72.    The Website's landing page has a drop-down menu of options, including "request my medical records." If a user clicks on that option, the LinkedIn Insight Tag intercepts, records, and transmits that information to LinkedIn along with the user's unique identifiers:

21

73.    Plaintiffs and the Class Members never consented, authorized, or otherwise permitted Defendant to disclose their personally identifiable and protected health information to LinkedIn.  Plaintiffs were not provided with any prior written notice that Defendant disclosed their Sensitive Information, nor were they provided any means of opting out of such disclosures. Even so, Defendant knowingly and intentionally disclosed Plaintiffs' and the Class Members' protected and private information via the LinkedIn Insight Tag.

### E.    Snap Pixel

74.    Snapchat is another social media company that has over 750 million users, including approximately 150 million in the U.S.[31]  Like Meta and LinkedIn, Snapchat generates substantial revenue by selling advertising on its platform.  In 2022, Snapchat generated approximately $4.6 billion in revenue, with roughly 99 percent coming from advertising.[32]

75.    Like Meta and LinkedIn, Snapchat sells its ability to create "custom audiences" and directly target consumers who are most apt to buy goods or services from the companies advertising on Snapchat's platform.[33]  One of the technologies Snapchat uses to effectively target ads is the Snap Pixel, "a tool that helps advertisers measure results, optimize audience targeting, and build audiences for their ad campaigns."[34]

76.    The Snap Pixel is a free piece of code that companies can install on their websites to track their customers' online activities.  The Snap Pixel "can track a variety of actions on [a] website, such as page views, add-to-cart actions, purchases, and sign-ups."[35]  This user data then allows companies to "create Pixel Custom Audiences to reach people who've already engaged with [the] business" or to "create Lookalike Audiences to reach people who are similar to [] current customers."[36]

---

[31]    https://techcrunch.com/2023/02/16/snapchat-announces-750-million-monthly-active-users/
[32]    https://www.investopedia.com/articles/investing/061915/how-snapchat-makes-money.asp
[33]    https://forbusiness.snapchat.com/advertising/targeting
[34]    https://forbusiness.snapchat.com/advertising/snap-pixel
[35]    https://forbusiness.snapchat.com/advertising/snap-pixel
[36]    *Id.*

1    77.    The Snap Pixel transmits the user's interactions with the website along with
2    various identifiers and cookies that Snapchat then uses to link the user to a Snapchat account.[37]

3    78.    The following is an example of how Defendant uses the Snap Pixel on its Website.
4    The Website's landing page has an icon called "Classes and Events."  If a user clicks on that
5    icon, the user can search for a variety of classes and events on specific healthcare topics, such
6    as "Healthy Pregnancy."  By selecting the "Healthy Pregnancy" class, and clicking "Submit,"
7    the Website displays the following page:



17    79.    Unbeknownst to the user, the Snap Pixel intercepts, records, and transmits to
18    Snapchat the specific page URL visited, to include the name of the class, "Healthy Pregnancy,"
19    along with cookies and other identifiers to link the search to a Snapchat account for purposes of
20    future targeted advertising.

21    80.    As another example, the Website's landing page lists along the top of the page
22    various options, including, "Pay My Bill."  If a user clicks on that option to pay his or her
23    medical bill at TMC Health, the Snap Pixel intercepts, records, and transmits that information
24    to Snapchat along with unique identifiers used to link the activity to a specific Snapchat account:

---

[37]    https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US





81.     Plaintiffs and the Class Members never consented, authorized, or otherwise permitted Defendant to disclose their personally identifiable and protected health information to Snapchat.  Plaintiffs were not provided with any prior written notice that Defendant disclosed their Sensitive Information, nor were they provided any means of opting out of such disclosures. Even so, Defendant knowingly and intentionally disclosed Plaintiffs' and the Class Members' protected and private information via the Snap Pixel.

**F.     Visitor Web Tracking by CallRail**

82.     Defendant also implements a tracking technology that records all webpages users visited on the Website in order to link the users' webpage activity with a users' subsequent

phone calls to Defendant. This web-tracking technology is provided by a company called CallRail, Inc.  The purpose of the CallRail tracking code is to gain insights into user activity in the lead-up to phone calls with the Defendant.  CallRail's services allow companies like Defendant to "track every visitor to [its] website, regardless of their marketing source."[38]

83.    The information available with CallRail's visitor tracking includes, "Source Type (Google PPC, Google Organic, referrals from yelp.com, etc.); Keywords (for all PPC, including Bing & Yahoo calls); Landing page; Complete page view history of the caller; Referring domain; Medium; Tracking number called; Date and time of the call; Caller ID; City; Duration of the call; and Device type."[39]

84.    As with the other tracking technologies used by Defendant, the CallRail tracking code resulted in the unauthorized disclosure of Sensitive Information related to patients' interactions with Defendant's Website, including "complete page view history" that would include research regarding specific symptoms/conditions or searches for particular physicians, among other sensitive information.

85.    Defendant's use of the CallRail tracking code on its Website is reflected below:



86.    Plaintiffs and the Class Members never consented, authorized, or otherwise permitted Defendant to disclose their personally identifiable and protected health information to CallRail.  Plaintiffs were not provided with any prior written notice that Defendant disclosed

---

[38]    https://support.callrail.com/hc/en-us/articles/5712712532109-Visitor-tracking-basics

[39]    *Id.*

their Sensitive Information, nor were they provided any means of opting out of such disclosures. Even so, Defendant knowingly and intentionally disclosed Plaintiffs' and the Class Members' protected and private information.

### G.    Exposure of Sensitive Information Creates a Substantial Risk of Harm

87.    The Federal Trade Commission ("FTC") has recognized that consumer data is a lucrative (and valuable) form of currency.  In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable.  Data is currency."[40]

88.    The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business.  According to the FTC, reasonable data security protocols require, among other things: (1) using industry tested and accepted methods; (2) monitoring activity on networks to uncover unapproved activity; (3) verifying that privacy and security features function properly; and (4) testing for common vulnerabilities or unauthorized disclosures.[41]

89.    The FTC cautions businesses that failure to protect Sensitive Information and the resulting privacy breaches can destroy consumers' finances, credit history, and reputations, and can take time, money and patience to resolve the effect.[42]  Indeed, the FTC treats the failure to implement reasonable and adequate data security measures as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

### H.    Plaintiffs' and the Class's Sensitive Information is Valuable

90.    The personal and health information of Plaintiffs and the Class is valuable and has

---

[40]    Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009) (last visited Aug. 29, 2023) https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf

[41]    *Start With Security, A Guide for Business,* FTC (last visited Aug. 29, 2023) https://www.ftc.gov/business-guidance/resources/start-security-guide-business

[42]    *See* Taking Charge, What to Do if Your Identity is Stolen, FTC, at 3 (2012) (last visited Aug. 29, 2023), https://www.myoccu.org/sites/default/files/pdf/taking-charge-1.pdf

become a highly desirable commodity.  Indeed, one of the world's most valuable resources is the exchange of personal data.[43]

91.     Business News Daily reported that businesses collect personal data (i.e., gender, web browser cookies, IP addresses, and device IDs), engagement data (i.e., consumer interaction with a business's website, applications, and emails), behavioral data (i.e., customers' purchase histories and product usage information), and attitudinal data (i.e., consumer satisfaction data) from consumers.[44]  Companies then use this data to impact the customer experiences, modify their marketing strategies, publicly disclose or sell data, and even to obtain more sensitive data that may be even more lucrative.[45]

92.     The power to capture and use customer data to manipulate products, solutions, and the buying experience is invaluable to a business's success.  Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[46]

93.     In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[47]  In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[48]

---

[43]     *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[44]     Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, BUSINESS   NEWS   DAILY   (Aug.   5,   2022;   updated   Aug.   25,   2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.

[45]     *Id.*

[46]     Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, MCKINSEY (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[47]     Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220, OECD PUBLISHING PARIS, (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[48]     *Id.* at 25.

94.     OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e., $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record.  A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[49]

95.     Unlike financial information, such as credit card and bank account numbers, PHI and certain PII cannot be easily changed.  Dates of birth and social security numbers are given at birth and attach to a person for the duration of his or her life.  Medical histories are inflexible. For these reasons, these types of information are the most lucrative and valuable.[50]

96.     Consumers place a considerable value on their Sensitive Information and the privacy of that information.  One 2002 study determined that U.S. consumers highly value a website's protection against improper access to their Sensitive Information, between $11.33 and $16.58 per website.  The study further concluded that to U.S. consumers, the collective "protection against error, improper access, and secondary use of personal information is worth between $30.49 and $44.62.[51]  This data is approximately twenty years old, and the dollar amounts would likely be exponentially higher today.

97.     Defendant's privacy violations exposed a variety of Sensitive Information, including medical conditions, symptoms, treatments sought, physicians, search queries, patient status, and other highly sensitive data.

98.     Some industry insiders and journalists are even calling hospitals the "brokers to technology companies" for their role in data sharing in the $3 trillion healthcare sector.[52]  "Rapid

---

[49]     *Id.*

[50]     *Calculating the Value of a Privacy Breach – What Are the Most Valuable Files to a Hacker?* Donnellon McCarthy Enters., https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/ (last visited Aug. 29, 2023).

[51]     11-Horn Hann, Kai-Lung Hui, *et al*, *The Value of Online Information Privacy: Evidence from the USA and Singapore,* at 17. Marshall Sch. Bus., Univ. So. Cal. (Oct. 2002), https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited Aug. 29, 2023).

[52]     Melanie Evans, *Hospitals Give Tech Giants Access to Detailed Medical Records*, The Wall Street Journal, (Jan. 20, 2020), https://www.wsj.com/articles/hospitals-give-tech-giants-access-to-detailed-medical-records-11579516200.

digitization of health records … have positioned hospitals as a primary arbiter of how much sensitive data is shared."[53]

99.    Third-party technology companies, like Meta, LinkedIn, and Snapchat, generate a substantial portion of their revenue through highly targeted advertising—a valuable service that is enabled by entities like Defendant sharing information about their users' online activities. Entities, like Defendant, likewise benefit financially from the collection and sharing of user data by increasing sales or customer acquisitions while also reducing advertising costs.[54] Through Defendant's conduct described herein, Plaintiffs and the Class lost the benefit and financial value of their private data, while Defendant unjustly benefitted.

## I.    Plaintiffs and the Class Had a Reasonable Expectation of Privacy in Their Interaction with Defendant's Website

100.    Consumers are concerned about entities, like Defendant, collecting their data and assume the data they provide, particularly highly sensitive medical data, will be kept secure and private.

101.    In a recent survey related to internet user expectations, most website visitors stated they assume their detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[55]  As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[56]

102.    The majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its'

---

[53]    *Id.*

[54]    *See* Meta Pixel Case Studies, https://www.facebook.com/business/tools/meta-pixel/case-studies (last visited Aug. 30, 2023)

[55]    *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.

[56]    Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, THE INFORMATION SOCIETY, 38:4, 257, 258 (2022).

customers' data.[57]   A March 2000 BusinessWeek/Harris Poll found that 89% of respondents were uncomfortable with web tracking schemes where data was combined with an individual's identity.[58]  The same poll found that 63% of respondents were uncomfortable with web tracking even where the clickstream data was not linked to personally identifiable information.[59]  A July 2000 USA Weekend Poll showed that 65% of respondents thought that tracking computer use was an invasion of privacy.[60]

103.   Patients and website users act consistently with their expectation of privacy.  For example, following a new rollout of iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[61]

104.   Like the greater population, Defendant's patients and prospective patients would expect the highly sensitive *medical* information they provided to Defendant through its Website to be kept secure and private.

**J.    Defendant's Conduct Violated HIPAA**

105.   Under HIPAA, individuals' health information must be:

> properly protected while allowing the flow of health information needed to provide and promote high quality health care and to protect the public's health and well-being.  The Privacy Rule strikes a balance that permits important uses of information while protecting the privacy of people who seek care and healing.[62]

106.   HIPAA is a "federal law that required the creation of national standards to protect sensitive patient health information from being disclosed without the patient's consent or

---

[57]   *Public Opinion on Privacy*, Epic.Org, https://archive.epic.org/privacy/survey/.

[58]   *Id.*

[59]   *Id.*

[60]   *Id.*

[61]   Margaret Taylor, *How Apple screwed Facebook*, Wired, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

[62]   U.S. Dept. of Health & Human Services: Summary of the HIPAA Privacy Rule (last visited Aug. 29, 2023), https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html.

knowledge."[63]    The rule requires appropriate administrative, physical, and technological safeguards to ensure the confidentiality, integrity, and security of electronic protected health information.[64]

107.    The Privacy Rule protects from unauthorized disclosure all "individually identifiable health information" held or transmitted by a covered entity or its business associate, in any form or media, whether electronic, paper, or oral.  The Privacy Rule calls this information "protected health information (PHI)."    "Individually identifiable health information" is information, (1) that relates to: the individual's past, present or future physical or mental health or condition; the provision of health care to the individual; or the past, present, or future payment for the provision of health care to the individual; and (2) that identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual.[65]

108.    The U.S. Department of Health and Human Services, Office for Civil Rights ("OCR") issued guidance in December 2022 warning about violations of the Privacy Rule based on the use of tracking technologies on health-care providers' websites.  According to the OCR guidance, "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."[66]  This includes "disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations."[67]

---

[63]    *Health Insurance Portability and Accountability Act of 1996 (HIPAA),* Centers for Disease Control and Prevention (last visited Aug. 29, 2023) https://www.cdc.gov/phlp/publications/topic/hipaa.html#:~:text=Health%20Insurance%20Portability%20and%20Accountability%20Act%20of%201996%20(HIPAA),-On%20This%20Page&text=The%20Health%20Insurance%20Portability%20and,the%20patient's%20consent%20or%20knowledge.

[64]    U.S. Dept. of Health & Human Services: Summary of the HIPAA Privacy Rule https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html.

[65]    *Id.*

[66]    *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (last visited Aug. 29, 2023) https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html#ftnref29

[67]    *Id.*

109.    OCR specifically warned about the dangers of disclosing PHI through a website's "unauthenticated webpage," or the portion of the site that does "not require users to log in before they are able to access the webpage."[68]   According to the OCR guidance, "in some cases, tracking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to the tracking technology vendors."[69] Examples include, "[t]racking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials," and that are tied to individual identifiers, such as "an individual's email address and/or IP address."[70]

110.    Finally, the OCR guidance explained that data that could be used to identify individuals—such as IP addresses—qualified as PHI even if the person did not have an existing relationship with the health care provider.   According to the OCR guidance, information gathered through tracking technologies on healthcare websites,

> might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code. All such IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[71]

111.    Through its use of tracking technologies on its Website to record and transmit Sensitive Information about its patients and prospective patients—along with identifiers (such

---

[68]    *Id.*

[69]    *Id.*

[70]    *Id.*; *see also* 45 C.F.R. § 164.514 (2) (defining personally identifiable information to include "any unique identifying number, characteristic or code" and specifically listing the example of IP addresses).

[71]    *Id.*

as IP addresses and cookies) that third-party technology companies could use to identify individuals—Defendant violated HIPAA.

### K.    Plaintiffs' Experience

*Plaintiff G. Williams*

112.    As a condition of receiving Defendant's services, Plaintiff G. Williams disclosed his Sensitive Information to Defendant through Defendant's Website on numerous occasions, and most recently in 2023.

113.    Plaintiff G. Williams accessed Defendant's Website on his personal phone and computer in connection with healthcare services he received from Defendant.

114.    Plaintiff G. Williams visited Defendant's Website to research his symptoms and conditions, his current or prospective doctors, and also to schedule his appointments.    In addition, Plaintiff G. Williams used the patient portal on the Defendant's Website to review his test results.    Given Plaintiff G. Williams's communications to Defendant's Website, he was identified or there was a reasonable basis to identify him as a patient of Defendant.    His patient status, along with the information he was reviewing online, such as searches for symptoms and doctors, were all transmitted to third parties like Meta.    Thus, Meta received Plaintiff G. Williams's medical and health records without his authorization or consent.

115.    Plaintiff G. Williams stayed logged-in to his accounts with Facebook, Instagram, LinkedIn, and Snapchat when browsing the internet, including when visiting Defendant's Website.

116.    Plaintiff G. Williams reasonably expected that his communications with Defendant via the Website were confidential, solely between himself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

117.    As a result of the tracking technologies Defendant chose to install on its Website, Plaintiff G. Williams's Sensitive Information was intercepted, viewed, analyzed, and used by unauthorized third parties. Defendant also used Plaintiff G. Williams's Sensitive Information for commercial gain after it was unlawfully intercepted by Meta and other third parties.

118.    Plaintiff G. Williams never consented to the disclosure of or use of his Sensitive Information by third parties or to Defendant enabling third parties to access or interpret such information.

119.    By embedding the tracking technologies and making these disclosures without his consent, Defendant breached Plaintiff G. Williams's privacy and unlawfully disclosed his Sensitive Information.

120.    Plaintiff G. Williams has a continuing interest in ensuring that Sensitive Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

***Plaintiff B. Williams***

121.    As a condition of receiving Defendant's services, Plaintiff B. Williams disclosed his Sensitive Information to Defendant through Defendant's Website on numerous occasions, and most recently in early 2023.

122.    Plaintiff B. Williams accessed Defendant's Website on his personal phone in connection with healthcare services he received from Defendant.

123.    Plaintiff B. Williams visited the Defendant's Website to search for his current or prospective doctors, including by typing information into the Website's "search" bar. He also used the patient portal on the Defendant's Website to schedule his appointments, pay bills, and search for his current or prospective doctors. Given Plaintiff B. Williams's communications to Defendant's Website, he was identified or there was a reasonable basis to identify him as a patient of Defendant.  His patient status, along with the information he was reviewing online, such as searches for doctors, were all transmitted to third parties like Meta.  Thus, Meta received Plaintiff B. Williams's medical and health records without his authorization or consent.

124.    Plaintiff B. Williams stayed logged-in to his Facebook account when browsing the internet, including when visiting Defendant's Website.

125.    Plaintiff B. Williams reasonably expected that his communications with Defendant via the Website were confidential, solely between himself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

34

126.    As a result of the tracking technologies Defendant chose to install on its Website, Plaintiff B. Williams's Sensitive Information was intercepted, viewed, analyzed, and used by unauthorized third parties. Defendant also used Plaintiff B. Williams's Sensitive Information for commercial gain after it was unlawfully intercepted by Meta and other third parties.

127.    Plaintiff B. Williams never consented to the disclosure of or use of his Sensitive Information by third parties or to Defendant enabling third parties to access or interpret such information.

128.    By embedding the tracking technologies and making these disclosures without his consent, Defendant breached Plaintiff B. Williams's privacy and unlawfully disclosed his Sensitive Information.

129.    Plaintiff B. Williams has a continuing interest in ensuring that Sensitive Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

***Plaintiff Daughtery***

130.    As a condition of receiving Defendant's services, Plaintiff Daughtery disclosed his Sensitive Information to Defendant through Defendant's Website on numerous occasions in 2021 and 2022.

131.    Plaintiff Daughtery accessed Defendant's Website on his personal computer in connection with healthcare services he received from Defendant.

132.    Plaintiff Daughtery visited the Defendant's Website to search for his current or prospective doctors, including by typing information into the Website's "search" bar, and to search for information about symptoms and conditions for himself and family members.  He also used the patient portal on the Defendant's Website to obtain his medical records.  Given Plaintiff Daughtery's communications to Defendant's Website, he was identified or there was a reasonable basis to identify him as a patient of Defendant.  His patient status, along with the information he was reviewing online, such as searches for doctors, were all transmitted to third parties like Meta.  Thus, Meta received Plaintiff Daughtery's medical and health records without his authorization or consent.

133.   Plaintiff Daughtery stayed logged-in to his accounts with Facebook and LinkedIn when browsing the internet, including when visiting Defendant's Website.

134.   Plaintiff Daughtery reasonably expected that his communications with Defendant via the Website were confidential, solely between himself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

135.   As a result of the tracking technologies Defendant chose to install on its Website, Plaintiff Daughtery's Sensitive Information was intercepted, viewed, analyzed, and used by unauthorized third parties. Defendant also used Plaintiff Daughtery's Sensitive Information for commercial gain after it was unlawfully intercepted by Meta and other third parties.

136.   Plaintiff Daughtery never consented to the disclosure of or use of his Sensitive Information by third parties or to Defendant enabling third parties to access or interpret such information.

137.   By embedding the tracking technologies and making these disclosures without his consent, Defendant breached Plaintiff Daughtery's privacy and unlawfully disclosed his Sensitive Information.

138.   Plaintiff Daughtery has a continuing interest in ensuring that Sensitive Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

***Plaintiff Milford***

139.   As a condition of receiving Defendant's services, Plaintiff Milford disclosed her Sensitive Information to Defendant through Defendant's Website on numerous occasions in the last several years, and most recently in August 2023.

140.   Plaintiff Milford accessed Defendant's Website on her personal phone in connection with healthcare services she received from Defendant.

141.   Plaintiff Milford visited the Defendant's Website to search for her symptoms and conditions, including by typing information into the Website's "search" bar.  She also used the patient portal on the Defendant's Website to obtain her medical records and review messages with her doctors. Given Plaintiff Milford's communications to Defendant's Website, she was

identified or there was a reasonable basis to identify her as a patient of Defendant.  Her patient status, along with the information she was reviewing online, such as searches for symptoms and conditions, were all transmitted to third parties like Meta.  Thus, Meta received Plaintiff Milford's medical and health records without her authorization or consent.

142.    Plaintiff Milford stayed logged-in to her accounts with Facebook, Instagram, and Snapchat when browsing the internet, including when visiting Defendant's Website.

143.    Plaintiff Milford reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

144.    As a result of the tracking technologies Defendant chose to install on its Website, Plaintiff Milford's Sensitive Information was intercepted, viewed, analyzed, and used by unauthorized third parties. Defendant also used Plaintiff Milford's Sensitive Information for commercial gain after it was unlawfully intercepted by Meta and other third parties.

145.    Plaintiff Milford never consented to the disclosure of or use of her Sensitive Information by third parties or to Defendant enabling third parties to access or interpret such information.

146.    By embedding the tracking technologies and making these disclosures without her consent, Defendant breached Plaintiff Milford's privacy and unlawfully disclosed her Sensitive Information.

147.    Plaintiff Milford has a continuing interest in ensuring that Sensitive Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

**CLASS PERIOD**

148.    For purposes of this Class Action Complaint, the Class Period corresponds to the period between September 2021 and the present and runs until such date as the Court enters an Order certifying any Count of this Class Action Complaint for class action treatment.

**CLASS ALLEGATIONS**

149.    Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated, as representatives of the following Class:

> All persons in Arizona whose Sensitive Information was disclosed to a third-party through Defendant's Website without authorization or consent during the Class Period.

150.    Excluded from the Class are Defendant; officers, directors, and employees of Defendant; any entity in which Defendant has a controlling interest in, is a parent or subsidiary of, or which is otherwise controlled by Defendant; and Defendant's affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assignees.  Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

151.    Plaintiffs reserve the right to modify and/or amend the Class definition as necessary.

152.    All members of the proposed Class are readily identifiable through Defendant's records.

153.    All requirements for class certification under Fed.R.Civ.P. 23(a), 23(b)(2) and 23(b)(3) are satisfied.

154.    **Numerosity.**  The members of the Class are so numerous that joinder of all members of the Class is impracticable.  Plaintiffs are informed and believe that the proposed Class includes a population of residents of approximately one million people.  The precise number of Class Members is unknown to Plaintiffs but may be ascertained from Defendant's records.

155.    **Commonality and Predominance.**  This action involves common questions of law and fact to the Plaintiffs and Class Members, which predominate over any questions only affecting individual Class Members.  These common legal and factual questions include, without limitation:

a.    Whether Plaintiffs' and Class Members' communications with Defendant's Website were unlawfully intercepted and disclosed to third parties

b.   Whether Defendant owed Plaintiffs and the other Class Members a duty to adequately protect their Sensitive Information;

c.   Whether Defendant owed Plaintiffs and the other Class Members a duty to secure their Sensitive Information from disclosure via third-party tracking technologies;

d.   Whether Defendant owed Plaintiffs and the other Class Members a duty to implement reasonable data privacy protection measures because Defendant accepted, stored, created, and maintained highly sensitive information concerning Plaintiffs and the Class;

e.   Whether Defendant knew or should have known of the risk of disclosure of data through third-party tracking technologies;

f.   Whether Defendant breached its duty to protect the Sensitive Information of Plaintiffs and other Class Members;

g.   Whether Defendant knew or should have known about the inadequacies of its privacy protection;

h.   Whether Defendant failed to use reasonable care and reasonable methods to safeguard and protect Plaintiffs' and the Class's Sensitive Information from unauthorized disclosure;

i.   Whether proper data security measures, policies, procedures and protocols were enacted within Defendant's computer systems to safeguard and protect Plaintiffs' and the Class's Sensitive Information from unauthorized disclosure;

j.   Whether Defendant's conduct was the proximate cause of Plaintiffs' and the Class's injuries;

k.   Whether Plaintiffs and the Class had a reasonable expectation of privacy in their Sensitive Information;

l.   Whether Plaintiffs and the Class suffered ascertainable and cognizable injuries as a result of Defendants' misconduct;

m.   Whether Plaintiffs and the Class are entitled to recover damages; and

n.    Whether Plaintiffs and the Class are entitled to other appropriate remedies including injunctive relief.

156.   Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiffs on behalf of themselves and the Class.  Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.

157.   **Typicality.**  Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Information, like that of every other Class member, was improperly disclosed by Defendant.  Defendant's misconduct impacted all Class Members in a similar manner.

158.   **Adequacy.**  Plaintiffs will fairly and adequately represent and protect the interest of the members of the Class and have retained counsel experienced in complex consumer class action litigation and intend to prosecute this action vigorously.  Plaintiffs have no adverse or antagonistic interests to those of the Class.

159.   **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant.  The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims.  There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court.  Absent a class action, individual patients like Plaintiffs would find the cost of litigating their claims prohibitively high and would have no effective remedy for monetary relief.

160.   Class Certification under Fed.R.Civ.P. 23(b)(2) is also appropriate.  Defendant has acted or refused to act on grounds that apply generally to the Class, thereby making monetary, injunctive, equitable, declaratory, or a combination of such relief appropriate. As Defendant continues to engage in the practices described herein, the risk of future harm to Plaintiffs and

the Class remains, making injunctive relief appropriate. The prosecution of separate actions by all affected individuals with dealings and contracts similar to Plaintiffs', even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to individual patients, which would establish potentially incompatible standards of conduct for Defendant, and/or (b) adjudications with respect to individual patients which would, as a practical matter, be dispositive of the interests of the other patients not parties to the adjudications, or which would substantially impair or impede the ability to protect the interests of the Class. Further, the claims of individual patients in the defined Class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

## CLAIMS

### <u>COUNT I</u>

### VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA") 18 U.S.C. § 2511(1), *et seq.*

161.    Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

162.    The primary purpose of ECPA is to protect the privacy of communications.

163.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of ECPA.

164.    The transmissions of Plaintiffs' PII and PHI to Defendant's Website qualifies as a "communication" under ECPA's definition of 18 U.S.C. § 2510(12).

165.    <u>Electronic Communications.</u> The transmission of PII and PHI between Plaintiffs and Class Members and Defendant's Website are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

41

166.  <u>Content.</u> ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

167.  <u>Interception.</u> ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

168.  <u>Electronical, Mechanical, or Other Device.</u> ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

169.  The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.  Plaintiffs' and Class Members' browsers;

    b.  Plaintiffs' and Class Members' computing devices;

    c.  Defendant's web-servers; and,

    d.  The tracking technology code deployed by Defendant to effectuate sending and acquiring patient communications.

170.  By utilizing and embedding the tracking technologies on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

171.  Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the tracking technologies, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Sensitive Information to third parties.

172.  Defendant intercepted communications that include, but are not limited to, communications from Plaintiffs and Class Members regarding Sensitive Information.

173.  By intentionally disclosing or endeavoring to disclose Plaintiffs' and Class Members' electronic communications to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

174.    By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

175.    <u>Unauthorized Purpose.</u> Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing tortious and criminal acts in violation of the Constitution or laws of the United States or of any State. Indeed, Defendant's primary purpose for deploying the tracking technologies was to secretly and deceptively, without permission, collect data from users in violation of their privacy rights.

176.    By embedding the tracking technologies on its Website and disclosing the content of patient communications relating to medical research, patient status, doctors, and other Sensitive Information, TMC Health had a purpose that was tortious, criminal, and designed to violate state and federal laws including:

    a.  An intentional intrusion into a private place or matter that would be highly offensive to a reasonable person;

    b.  A violation of the Arizona Consumer Fraud Act;

    c.  A violation of 42 U.S.C. § 1320d-6, the Administrative Simplification subtitle of HIPAA, which protects against the disclosure of individually identifiable health information to another person and is a criminal offense punishable by fine or imprisonment;

    d.  A violation of HIPAA; and

    e.  A violation of Arizona's computer tampering statute. A.R.S. § 13-2316(A)(1).

177.    42 U.S.C. § 1320d-6 provides criminal and civil penalties against a healthcare provider who "knowingly ... discloses individually identifiable health information to another person." Section 1320d(6) of HIPAA defines individually identifiable health information (IIHI) as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and—(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d(6).

178.    Guidance issued by the Department of Health and Human Services (HHS) confirms that the type of online tracking technologies deployed by Defendant violates HIPAA. HIPAA prohibits disclosing patients' health information via tracking technologies on both user-authenticated webpages (such as the patient portal) and unauthenticated webpages. The guidance includes IP addresses, device IDs, and unique identifying codes collected on a regulated entity's website in the definition of IIHI. As described above, Plaintiffs entered data on Defendants' website relating to their private medical issues and some later received advertisements. This shows that through the tracking technologies employed, Defendant disclosed its patients' individually identifiable health information to third parties in violation of the ECPA, and the criminal or tortious purpose exception in § 2511(2)(d) does not relieve Defendant of liability.

179.    Defendant was not acting under color of law to intercept Plaintiffs' and the Class Members' wire or electronic communications.

180.    Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy via the tracking technologies.

181.    A person who violates § 2511(1)(a) is liable for $10,000 in statutory damages to any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used.

182.    Defendant is liable to Plaintiffs and Class Members for violations of the ECPA.

183.    Based on the foregoing, Plaintiffs and Class Members seek all other relief as the Court may deem just and proper, including all available monetary relief, injunctive and declaratory relief, any applicable penalties, and reasonable attorneys' fees and costs.

**COUNT II**

**VIOLATION OF ARIZONA CONSUMER FRAUD ACT**

**A.R.S. §44-1521 *et seq.***

184.    Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

185.    The Arizona Consumer Fraud Act, A.R.S. 44-1521 *et seq.*, prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of Arizona.

186.    A.R.S. § 44-1522 provides in pertinent part:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, ***or concealment, suppression or omission of any material fact*** with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

187.    By the acts and conduct alleged herein, Defendant was selling or advertising merchandise (including services) as those terms are defined in A.R.S. § 44-1521.

188.    Defendant committed unfair or deceptive acts and practices in and from Arizona, in violation of the Arizona Consumer Fraud Act, by concealing, suppressing, and omitting material facts regarding its use of tracking technologies on the Website to intercept and disclose Plaintiffs' and Class Members' Sensitive Information.

189.    Defendant's omission of these material facts was designed to mislead Plaintiffs and Class Members and induce them to provide Sensitive Information to Defendant via the Website.  Specifically, Defendant was aware that Plaintiffs and Class Members depended and relied upon it to keep their communications confidential, and Defendant instead knowingly disclosed that information to third-party technology companies. Reasonable people in the position of Plaintiffs and the Class would have wanted to know the omitted facts before making a decision to use Defendant's Website further.

190.    Defendant had a duty to disclose in a clear and conspicuous manner to Plaintiffs and the Class that Defendant disclosed their Sensitive Information to third parties.  Defendant's

duties arose out of the special relationship with its patients and prospective patients; contractual obligations arising from the Privacy Policy on its Website; partial, incomplete and/or inconsistent disclosures; and public policy, including federal statutes that prohibit the unauthorized disclosure of PHI. Defendant knew that Plaintiffs' and the Class Member's Sensitive Information was private and confidential and should be protected from unauthorized disclosure to third parties. Informed consent for Defendant's conduct was not obtained by Defendant from Plaintiffs and the Class.

191.    Defendant's omission was material because it logically related to Plaintiffs' and Class Members' use of Defendant's Website and was rationally significant to the parties given Plaintiffs' and Class Members' communication of Sensitive Information via the Website and Defendant's promises to safeguard that information.

192.    Plaintiffs and Class Members were uniformly exposed to Defendant's omission when they visited Defendant's Website, which concealed, suppressed, and omitted any reference to the Defendant's use of the tracking technologies on the Website.

193.    Plaintiffs and Class Members relied on Defendant's omission by providing their Sensitive Information to Defendant via the Website not knowing that Defendant's use of the tracking technologies would intercept and disclose their Sensitive Information to third parties.

194.    As a direct and proximate result of Defendant's deceptive acts or practices, Plaintiffs and Class Members suffered and continue to suffer harm and injury.  Given the monetary value of individual personal information, Defendant deprived Plaintiffs and Class Members of the economic value of their interactions with Defendant's Website without providing proper consideration (or an opportunity to receive consideration) for Plaintiff's and Class Members' valuable personal information.

195.    Plaintiffs were also denied the benefit of the bargain when they paid Defendant (directly or indirectly) for healthcare services with the expectation that their Sensitive Information would be kept confidential.  Had they known the truth that Defendant secretly disclosed their Sensitive Information to third parties, they would have used the services of another healthcare provider, paid or demanded a lower price for Defendant's services, or had an

1  opportunity to seek consideration for the use of their Sensitive Information.

2  196.   Further, Defendant has improperly profited from its invasion of Plaintiffs' and the

3  Class Members' privacy in its use of their data for its economic value.

4  197.   Plaintiffs and the Class Members are entitled to damages, including

5  compensatory, punitive, and/or nominal damages in an amount to be proven at trial.

6  Alternatively, Plaintiffs are entitled to restitution and/or disgorgement of any profits Defendant

7  received as a result of its deceptive acts or practices.

8  ### COUNT III

9  ### NEGLIGENCE

10  198.   Plaintiffs re-allege and incorporate by reference every allegation contained in the

11  paragraphs above as though fully stated herein.

12  199.   At all relevant times, Defendant owed Plaintiffs and Class Members a duty to act

13  with reasonable care to secure and safeguard their Sensitive Information from unauthorized

14  disclosure to third parties. Defendant took on this obligation by soliciting and obtaining

15  Sensitive Information from Plaintiffs and the Class on its Website and maintaining the

16  information on its system and networks.

17  200.   Among these duties, Defendant was expected:

18      a.  To exercise reasonable care in obtaining, retaining, securing, safeguarding,

19         deleting and protecting the Sensitive Information in its possession;

20      b.  To protect Plaintiffs' and Class Members' Sensitive Information using reasonable

21         and adequate security procedures and systems compliant with industry-standard

22         practices;

23      c.  To implement processes to quickly detect unauthorized disclosures and to timely

24         act on warnings about such disclosures; and

25      d.  To promptly notify Plaintiffs and Class Members of any data breach or

26         unauthorized disclosure that affected or may have affected their Sensitive

27         Information.

28

201.   Defendant's duties arose out of the special relationship with its patients and prospective patients; contractual obligations arising from the Privacy Policy on its Website; and public policy, including federal statutes that prohibit the unauthorized disclosure of PHI.

202.   Defendant knew that Plaintiffs' and the Class Member's Sensitive Information was private and confidential and should be protected from unauthorized disclosure to third parties.

203.   Defendant knew that it solicited and obtained Sensitive Information from patients and prospective patients on its Website, including searches for specific symptoms and conditions, searches for doctors and treatments, and other sensitive health-related topics.

204.   Defendant knew or should have known that installing third-party tracking technologies on its Website would result in disclosure of Sensitive Information to third parties, particularly since various guidance, including the HHS-OCR guidance, was published on this issue and directed at entities like TMC Health.

205.   Defendant knew or should have known that the unauthorized disclosure of its patients and prospective patients' Sensitive Information collected via the Website would cause harm, including loss of privacy and loss of Plaintiffs' and Class Members' personal information.

206.   Defendant breached its duty of care to Plaintiffs and the Class Members in the following ways, among others:

a.   By failing to implement adequate data-security protocols to prevent the unauthorized disclosure of Sensitive Information collected via the Website;

b.   By failing to adhere to industry standards regarding the safeguarding of Sensitive Information and the use of online tracking technologies;

c.   By installing and deploying the tracking technologies and failing to monitor and prevent the collection and dissemination of Sensitive Information intercepted through the tracking technologies;

d.   By failing to adequately train IT staff, network security personnel, and/or marketing and advertising personnel to safeguard and protect from disclosure patients' Sensitive Information; and

48

e. By failing to implement processes to detect and respond to data breaches and unauthorized disclosures involving Sensitive Information and promptly notify affected patients.

207.    As a direct and proximate result of Defendant's breach and unauthorized disclosure of Plaintiffs' and the Class's Sensitive Information, Plaintiffs and Class Members suffered and continue to suffer harm and injury.  Given the monetary value of individual personal information, Defendant deprived Plaintiffs and Class Members of the economic value of their interactions with Defendant's website, without providing proper consideration (or an opportunity to receive consideration) for Plaintiff's and Class Members' valuable personal information.

208.    Plaintiffs were also denied the benefit of the bargain when they paid Defendant (directly or indirectly) for healthcare services with the expectation that their Sensitive Information would be kept confidential.  Had they known the truth that Defendant secretly disclosed their Sensitive Information to third parties, they would have used the services of another healthcare provider, paid or demanded a lower price for Defendant's services, or had an opportunity to seek consideration for the use of their Sensitive Information.

209.    Further, Defendant has improperly profited from its negligent disclosure of Plaintiffs' and the Class Members' Sensitive Information and Defendant's use of their data for its economic value.

210.    Plaintiffs and the Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages in an amount to be proven at trial.

## COUNT IV

### INVASION OF PRIVACY – INTRUSION UPON SECLUSION

211.    Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

212.    A claim for intrusion upon seclusion requires (1) an intentional intrusion, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns; and (ii) that the intrusion would be highly offensive to a reasonable person.

213.    By intentionally embedding and implementing the tracking technologies on its Website, Defendant intruded upon and permitted unauthorized third parties to intrude upon Plaintiffs' and the Class's private communications with Defendant regarding sensitive medical information.

214.    Plaintiffs and the Class have an objective, reasonable expectation of privacy in their communications with Defendant via the Website, particularly those containing sensitive medical information.

215.    Plaintiffs and the Class Members did not consent to, authorize, or know about Defendant's intrusion of their privacy at the time it occurred.  Plaintiffs and the Class Members never agreed that Defendant could install a recording device (Pixel or other tracking technologies) to actively record their Website sessions in real-time or disclose their Sensitive Information to third-party technology companies.

216.    Defendant's interception, recording, and disclosure of Plaintiffs' and the Class's Sensitive Information obtained via the Website is highly offensive to a reasonable person because the tracking was entirely surreptitious, and the disclosures relate to patients' and prospective patients' most sensitive personal information, including information about specific symptoms/conditions and treatments sought.  The disclosure is also highly offensive because it violates HIPAA, industry standards, and Defendant's own Privacy Policy.

217.    By implementing the tracking technologies on its Website, Defendant intentionally intruded on Plaintiff's and the Class's private life, seclusion, or solitude, without consent.  This conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

218.    As a direct and proximate result of Defendant's unauthorized disclosure of Plaintiffs' and the Class's private data, Plaintiffs and Class Members suffered and continue to suffer harm and injury.  Given the monetary value of individual personal information, Defendant deprived Plaintiffs and Class Members of the economic value of their interactions with Defendant's website, without providing proper consideration (or an opportunity to receive consideration) for Plaintiff's and Class Members' valuable personal information.

219.    Plaintiffs were also denied the benefit of the bargain when they paid Defendant (directly or indirectly) for healthcare services with the expectation that their Sensitive Information would be kept confidential.  Had they known the truth that Defendant secretly disclosed their Sensitive Information to third parties, they would have used the services of another healthcare provider, paid or demanded a lower price for Defendant's services, or had an opportunity to seek consideration for the use of their Sensitive Information.

220.    Further, Defendant has improperly profited from its invasion of Plaintiffs' and the Class Members' privacy in its use of their data for its economic value.

221.    Plaintiffs and the Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages in an amount to be proven at trial.

## COUNT V

### BREACH OF IMPLIED CONTRACT

222.    Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

223.    When Plaintiffs and Class Members paid money and provided their Sensitive Information to Defendant in exchange for services, they entered implied contracts pursuant to which Defendant agreed to safeguard and not disclose their Sensitive Information without Plaintiffs' and Class Members' consent.

224.    An implicit part of the agreement was that Defendant would safeguard Plaintiffs' and Class Members' Sensitive Information consistent with industry and regulatory standards and Defendant's privacy policy and would timely notify Plaintiffs in the event of a disclosure to third parties.

225.    Plaintiffs and Class Members would not have entrusted Defendant with their Sensitive Information in the absence of an implied contract between them and Defendant obligating Defendant not to disclose this information without consent.

226.    Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendant.

227.   Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Sensitive Information to various third parties, including Meta.

228.   As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members would not have used Defendant's services, or would have paid substantially less for these services, had they known their sensitive health-related information would be disclosed.

229.   Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breaches of implied contract.

## COUNT VI

### UNJUST ENRICHMENT

230.   Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

231.   Plaintiffs and Class Members provided their Sensitive Information to Defendant for the purposes of receiving healthcare services or healthcare-related information and knowledge.  Defendant receives a benefit from its use of Plaintiffs' and the Class Members' Sensitive Information, including costs savings for marketing and advertising and increased profits from the acquisition of new patients and existing patients seeking more services. Defendant intentionally collected and used Plaintiffs' and the Class Members' Sensitive Information for its own gain, without consent or authorization.

232.   Defendant unjustly retained those benefits at the expense of Plaintiffs and the Class Members and this conduct damaged Plaintiffs and the Class Members.  Plaintiffs and the Class Members were not compensated by Defendant for the data they provided.

233.   It would be inequitable and unjust for Defendant to retain any of the profit or other benefits derived from the secret, unfair, and deceptive data tracking methods Defendant employs on its Website.

234.   The Court should require Defendant to disgorge all unlawful or inequitable proceeds that it received into a common fund for the benefit of Plaintiffs and Class Members, and order other such relief as the Court may deem just and proper.

235.    Plaintiffs allege this claim in the alternative in the event Plaintiffs and Class Members have an inadequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment in their favor as follows:

a.    Certification of the Class pursuant to the provisions of Fed. R. Civ. P. 23 and an order that notice be provided to all Class Members;

b.    Designation of Plaintiffs as representatives of the Class and the undersigned counsel as Class Counsel;

c.    An award of damages in an amount to be determined at trial or by this Court;

d.    An order for injunctive relief, enjoining Defendant from engaging in the wrongful and unlawful acts described herein;

e.    An order for declaratory relief as may be appropriate;

f.    An award of statutory interest and penalties;

g.    An award of costs and attorneys' fees; and

h.    Such other relief the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully submitted,

ZIMMERMAN REED LLP

Dated: September 18, 2023        By:    /s/ Hart L. Robinovitch
Hart L. Robinovitch (AZ #020910)
Ryan J. Ellersick (*Pro Hac Vice forthcoming*)
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Telephone: (480) 348-6400
Fax: (480) 348-6415
hart.robinovitch@zimmreed.com
ryan.ellersick@zimmreed.com

*Attorneys for Plaintiffs*