Hart L. Robinovitch (AZ #020910)
Ryan J. Ellersick (AZ #038805)
**ZIMMERMAN REED LLP**
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Tel: (480) 348-6400
Fax: (480) 348-6415
hart.robinovitch@zimmreed.com
ryan.ellersick@zimmreed.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| George Williams, Sean Daughtery, and Margaret Milford, individually, and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TMC Health,<br><br>Defendant. | Case No. CV-23-00434-TUC-SHR<br><br>**REDACTED**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded |

1

Plaintiffs George Williams, Sean Daughtery, and Margaret Milford ("Plaintiffs"), on behalf of themselves and all others similarly situated, file this Second Amended Class Action Complaint against Defendant TMC Health, and in support state the following:

**INTRODUCTION**

1.      This case challenges Defendant TMC Health's secret and unauthorized disclosure of its patients' sensitive health information to third parties through various online tracking technologies.  TMC Health is one of the largest health systems in Southern Arizona, serving a population of over one million residents through its flagship hospital, Tucson Medical Center; multiple primary and specialty-care clinics; and several regional hospitals.   TMC Health also operates a website, www.tmcaz.com, (the "Website"), where it allows patients to search for doctors, research conditions and symptoms, and sign up for classes and events related to sensitive healthcare topics, such as "Preparation for Childbirth" and "Mental Health Resiliency." The Website also has a search feature where users can seek further information on sensitive topics they may be experiencing such as alcohol dependency, substance abuse, birth control, sexually transmitted diseases, or mental distress.

2.      Unbeknownst to its patients visiting the Website, TMC Health intercepted and disclosed to third-party technology companies its patients' activities on the Website in real-time, including specific searches for sensitive health-related topics. TMC Health intercepted its patients' website communications for the purpose of disclosing the communications to third-party technology companies like Meta Platforms, Inc., and Google, LLC, along with unique identifiers the AdTech companies could use to sync the website communications with individual accounts and retarget those patients with advertising.

3.      By intercepting its patients' communications for the purpose of disclosing individually identifiable health information to third-party AdTech companies for commercial gain, TMC Health acted with a criminal purpose in violation of the Health Insurance Portability and Accountability Act ("HIPAA"). Because the intended use of the interceptions was to disclose patient health information without consent and for commercial gain in violation of

HIPAA, TMC Health has no immunity under the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511.

4.     Plaintiffs bring this class action complaint on behalf of a class of TMC Health patients impacted by Defendant's secret and unauthorized disclosure of their highly sensitive Personal Health Information ("PHI") and Personally Identifiable Information ("PII") (collectively "Sensitive Information") to third parties.

5.     Defendant solicited and obtained Plaintiffs' and the Class's Sensitive Information in connection with its services as a healthcare provider. In operating the Website as part of its healthcare activities, Defendant promised its patients that their Sensitive Information was private and secure and would never be disclosed for "marketing purposes" absent written authorization.[1] Despite these representations and promises, Defendant intercepted and disclosed its patients' Sensitive Information for "marketing purposes" through various online tracking technologies. Because TMC Health misrepresented the privacy and security of its Website, Plaintiffs reasonably believed that their communications with TMC Health were private, between themselves and their healthcare provider.

6.     In June 2022, nonprofit newsroom The Markup published a story about healthcare providers, like Defendant, that were secretly disclosing sensitive health information to Facebook through an online tracking tool.  According to The Markup's report, "A tracking tool installed on many hospitals' websites has been collecting patients' sensitive health information— including details about their medical conditions, prescriptions, and doctor's appointments—and sending it to Facebook."[2]

7.     Like the healthcare providers referenced in The Markup's report, Defendant incorporated Meta Platform, Inc.'s ("Meta") tracking technology, the Meta Pixel ("Pixel"), on the Website.  Pixel is a snippet of code that, when embedded on a third-party website, tracks the

---

[1]     https://www.tmcaz.com/notice-of-privacy-practices

[2]     *Facebook Is Receiving Sensitive Medical Information from Hospital Websites* (June 16, 2022)    https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited Aug. 31, 2023).

website visitor's activity on that website and sends that data to Meta. Pixel tracks mouse clicks, words typed into search bars, and pages visited on the website, all of which can include sensitive personal and identifying information that is not anonymized. Indeed, the purpose of the Pixel is to target specific individuals with advertising based off the data gathered. Here, the information transmitted to Meta, without Plaintiffs' consent, included private healthcare information (including, but not limited to, searches for specific medical conditions, treatments and/or providers), which is some of the most personal and sensitive data Plaintiffs possess.

8. But Defendant's conduct is worse. In addition to deploying the Meta Pixel on the Website, Defendant incorporated tracking technologies from at least three other popular social media and advertising companies: LinkedIn, Snapchat, and Google. Like the Meta Pixel, the tracking codes from LinkedIn, Snapchat, and Google (collectively, the "Tracking Technologies") intercept mouse clicks, words typed into search bars, and pages visited on the Website—including searches for specific conditions, treatments, and doctors—and transmit that Sensitive Information to Meta, LinkedIn, Snapchat, and Google. The third-party AdTech companies then match those communications with unique identifiers to associate the Website visitor to their Meta, LinkedIn, Snapchat, and Google accounts for ad retargeting.

9. Defendant's use of online Tracking Technologies from Meta, LinkedIn, Snapchat, and Google allowed for a broad scope of patient information, including highly confidential medical information, to be collected and transmitted to third parties without patients' knowledge or consent.

10. In July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about the use of online tracking technologies that could result in unauthorized disclosures of Sensitive Information to third parties.[3] The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in

---

[3]  https://www.ftc.gov/business-guidance/blog/2023/07/ftc-hhs-joint-letter-gets-heart-risks-tracking-technologies-pose-personal-health-information

a wide range of harms to an individual or others."[4]  According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[5]

11.    Despite these warnings from federal regulators and the clear terms of Defendant's own Privacy Policy, Defendant TMC Health deployed the Tracking Technologies in a manner that resulted in the unauthorized disclosures of its patients' Sensitive Information.

12.    Defendant knew that the Tracking Technologies it deployed on the Website intercepted substantive communications of all website visitors, including searches for specific symptoms, conditions, treatments, and physicians. Defendant knew that the Tracking Technologies also disclosed unique identifiers for all website visitors, including cookies that the AdTech companies could use to sync the website communications to specific named individuals.

13.    Defendant also knew that many, if not most, of the individuals who used its Website to research symptoms, conditions, treatments, and physicians; to pay bills; to type queries into the search bar; and to engage in other health-related communications on the Website, were existing patients of TMC Health.

14.    Because TMC Health knew that the Tracking Technologies intercepted and disclosed information on every website visitor, and because TMC Health knew that many, if not most, of its Website visitors were patients, TMC Health necessarily knew that the Tracking Technologies intercepted and disclosed patient health information. Indeed, TMC Health deployed the Tracking Technologies for that very purpose: to disclose a patient's activities on the Website to the AdTech companies so TMC Health could retarget those patients with advertising.

---

[4]    https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

[5]    *Id.*

15. Defendant's disclosure of patient Sensitive Information allowed third parties to know that a specific patient was seeking confidential medical care of a particular type or being treated for a specific condition.

16. Plaintiffs and the Class never consented to, authorized, or otherwise agreed to allow Defendant to disclose their Sensitive Information to anyone other than those reasonably believed to be part of TMC Health, acting in some healthcare capacity.

17. As a direct and proximate result of Defendant's unauthorized disclosure of Plaintiffs' and the Class's Sensitive Information, Plaintiffs and the Class Members have suffered injury and harm and are entitled to statutory damages under the ECPA. Further, due to the ongoing and continuing risk of disclosure of information to third parties, creating the risk of further violations and harm, Defendant's conduct complained of herein should be enjoined.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the Complaint asserts claims pursuant to Defendant's violations of ECPA, 18 U.S.C. § 2511. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

19. This Court has personal jurisdiction over this action because Plaintiffs are residents and citizens of the State of Arizona who received health care from Defendant and visited Defendant's Website while in the State of Arizona. Defendant is an Arizona nonprofit corporation with its principal office located at 5301 E. Grant Road, Tucson, Arizona 85712.

20. Venue is proper in this Court because Defendant's headquarters is located within the District, and Plaintiffs' claims arise from Defendant's conduct in this District.

## PARTIES

21. **Plaintiff** George Williams is a natural person domiciled in the State of Arizona. At all relevant times, he resided in Tucson, Arizona. For the last several years, and most recently in early 2024, while a patient with TMC Health, he visited the Defendant's Website to access the patient portal. At all relevant times, Plaintiff Williams had accounts with Facebook,

6

Instagram,[6] LinkedIn, and Snapchat, and stayed logged-in to his accounts when browsing the internet.

22.     **Plaintiff** Sean Daughtery is a natural person domiciled in the State of Arizona.  At all relevant times, he resided in Tucson, AZ.  In 2021 and 2022, while a patient at TMC Health, he visited the Defendant's Website while in Arizona to search for his current or prospective doctors, including by typing information related to those doctors into the Website's "search" bar. Plaintiff Daughtery also searched on the Website for information about his medical symptoms, conditions, and treatments, including ██████████████████████████ ████████. In addition, he accessed Defendant's patient portal from Defendant's Website and used the portal on the Defendant's Website to review and obtain his medical records. At all relevant times, Plaintiff Daughtery had Facebook and LinkedIn accounts and stayed logged-in to his accounts when browsing the internet.

23.     **Plaintiff** Margaret Milford is a natural person domiciled in the State of Arizona. At all relevant times, she resided in Tucson, AZ.  For the last several years, and most recently in August 2022, while a patient at TMC Health, she visited the Defendant's Website while in Arizona to search for information about her medical conditions/symptoms and possible treatments related to ██████████, including by typing information into the Website's "search" bar. Plaintiff Milford also accessed the patient portal from Defendant's Website and used the portal on the Defendant's Website to check her lab results, review her doctors' messages, and obtain other medical information related to her healthcare from TMC Health. At all relevant times, Plaintiff Milford had Facebook and Snapchat accounts and stayed logged-in to her accounts when browsing the internet.

24.     Plaintiffs reasonably expected that their online communications with Defendant were between them and Defendant, would remain private, and would not be shared with third parties without their consent.

---

[6]     Instagram, another social media company, is owned by Meta.

25.    After using Defendant's Website, some Plaintiffs recall receiving health-related ads on Facebook, Instagram, LinkedIn, and Snapchat. Upon information and belief, these ads were targeted and resulted from Defendant's agreement with the AdTech companies to embed their Tracking Technologies on the Website and disclose Plaintiffs' Sensitive Information. For example, following his research on the TMC Health Website for issues related to his ████ ████ Plaintiff Daughtery recalls receiving Facebook ads soliciting his participation in research studies for ████████.

26.    **Defendant** is an Arizona nonprofit corporation with its principal place of business in Tucson, Arizona. TMC Health is the corporate entity that includes Tucson Medical Center; TMCOne primary and specialty care practices; and numerous other inpatient and outpatient facilities.[7]

## FACTUAL BACKGROUND

### A.    Defendant Collected, Maintained, and Stored Sensitive Information

27.    To obtain healthcare services, patients and prospective patients, like Plaintiffs and the Class, must provide Defendant with highly sensitive information, including PII, PHI, or both. Defendant serves a population of approximately one million residents, meaning it has created and maintains a massive repository of Sensitive Information.

28.    Defendant tells patients it will keep their Sensitive Information secure and private. Indeed, Defendant maintains a Notice of Privacy Practices on its Website that states, "TMC Health is required by law to maintain the privacy of PHI."[8] According to the Notice of Privacy Practices, this requirement comes from "[t]he Health Insurance Portability and Accountability Act (HIPAA)," which, "establishes national standards to protect individuals' medical records

---

[7]    These include: Peppi's House – TMC Hospice, TMC Integrative Pain Clinic, and TMC Wound Care Center; TMC Medical Network and TMCOne, including all ambulatory primary and specialty care clinics, TMC Urgent Care – Rincon, and TMC Urgent Care – Wyatt; Benson Hospital, including Benson Hospital Rehabilitation, Benson Family Health Care Clinic, Benson San Pedro Clinic, and Vail Valley Family HealthCare; Northern Cochise Community Hospital, including Sulphur Springs Medical Center and Sunsites Medical Clinic. *See* https://www.tmcaz.com/notice-of-privacy-practices.

[8]    https://www.tmcaz.com/notice-of-privacy-practices

and other personal health information."[9] The Notice also provides that TMC Health will notify patients about a breach of their Sensitive Information: "TMC Health is required by law to provide notification to affected individuals or their representatives and to the [Office for Civil Rights] for [Health and Human Services] following the discovery of a breach of unsecured PHI."[10]

29.    Importantly, Defendant also promises its patients and prospective patients who visit its Website: "TMC Health will obtain your authorization to use or disclose your PHI in the following circumstances: . . . disclosures for marketing purposes."[11]

30.    The Notice of Privacy Practices does not mention Defendant's use of the Tracking Technologies on its Website. Nor does Defendant mention its use of the Tracking Technologies on other parts of its Website. Given this lack of disclosures and TMC Health's affirmative representations that it will not disclose patient PHI for marketing purposes without consent, Plaintiffs reasonably expected that their website communications were private, between Plaintiffs and TMC Health.

**B.    Defendant Knowingly Exposed Its Patients' Sensitive Information**

31.    Defendant implemented several tracking technologies on its Website that intercepted and disclosed its patients' Sensitive Information to third parties for marketing and advertising purposes.  The Tracking Technologies included: the Meta Pixel, the LinkedIn Insight Tag, the Snap Pixel, and Google tracking code.

32.    The Tracking Technologies work by instructing a user's browser to duplicate web communications directed to TMC Health and simultaneously transmit those same communications to the third-party AdTech companies, effectively allowing the AdTech companies to "listen in" on Plaintiffs' and the Class's private communications with TMC Health.

---

[9]    *Id.*

[10]    *Id.*

[11]    *Id.*

33.     The express purpose for using the Tracking Technologies is to track and disclose a user's activities on a website, identify that individual user, and retarget that individual with advertising. For example, Meta tells web developers to "[i]nstall the Facebook pixel if you want to retarget your website visitors."[12] Meta explains that "[t]he Facebook pixel is a small snippet of code that you, your website engineer or a Facebook Business Partner can paste in your code. It tracks the people and the types of actions they take when they engage with your brand, including any of your Facebook ads they saw before going to your website, the pages of your site they visit and the items they add to their carts."

34.     Similarly, LinkedIn tells website developers, "Get more leads and conversions by retargeting your website visitors."[13] LinkedIn explains that "[a] potential customer visits your site but leaves. What do you do? With the Insight Tag, you can re-engage visitors by retargeting them through LinkedIn ads."

35.     The Snap Pixel serves the same purpose. "The Snap Pixel collects data on user activity on your website, such as page views, add-to-cart actions, purchases, and sign-ups."[14] Website developers can then use that data to "[c]reate Pixel Custom Audiences to reach people who've already engaged with your business."

36.     TMC Health could have configured its Website not to communicate or share any Sensitive Information with third parties, or to limit the information it communicated to third parties via the Tracking Technologies while maintaining the necessary security and confidentiality of its patients' Sensitive Information, but it did not.

37.     Given the sensitivity of health information, many of the AdTech companies actually advise website developers not to use the Tracking Technologies to transmit health information. For example, Meta tells website developers not to "transmit [i]nformation about an individual's physical or mental health," including "[d]iseases, medical conditions and injuries";

---

[12]     https://www.facebook.com/business/goals/retargeting
[13]     https://business.linkedin.com/marketing-solutions/insight-tag
[14]     https://forbusiness.snapchat.com/advertising/snap-pixel?lang=en-US#install

[s]exual and reproductive health"; and "[m]edical procedures, treatments and testing."[15] Similarly, Snapchat tells website developers, "Some websites and pages are not eligible for Snap Pixel. Our Personal Data Terms prohibit you from configuring the pixel in a way that would send health-related and other sensitive information to Snap."[16]

38.     Despite these warnings from the AdTech companies about violating their terms of use, TMC Health deployed the Tracking Technologies to intercept and disclose their patients' private health information anyway. Because TMC Health knew that the Tracking Technologies intercepted information on every website visitor and that many, if not most, of the visitors to the TMC Health website were patients, TMC Health deployed the Tracking Technologies knowing that patient health information would be disclosed to Meta, LinkedIn, Snapchat, and Google.

39.     Given the default settings for the Tracking Technologies, TMC Health intercepted and disclosed at least the following Sensitive Information of its patients: (1) Plaintiffs' and the Class Members' searches for treatment locations, specific medical providers, and particular medical conditions and treatments; (2) Plaintiffs' and Class Members' other activities on the Website related to the provision or payment of healthcare, including paying bills; and (3) PII, including but not limited to patients' locations, IP address, device identifier, cookies used to identify specific users, and/or individuals' unique account identifiers.  In short, Defendant intercepted and disclosed Plaintiffs' and the Class Members' activity on the Website along with personal identifying information to link specific users to their activity on the Website. The Sensitive Information disclosed by Defendant constituted actual content that revealed patients' medical conditions/symptoms, specific search queries, searches for particular doctors, searches for treatments, and/or other Sensitive Information.

C.     **The Meta Pixel**

---

[15]     https://www.facebook.com/business/help/361948878201809?id=188852726110565

[16]https://businesshelp.snapchat.com/s/article/pixel-faqs?language=en_US#:~:text=Some%20websites%20and%20pages%20are,what%20data%20you%20cannot%20send.

40.    Meta's, f/k/a Facebook, core business function is to sell advertising, and it does so on several platforms, including Facebook and Instagram.  The bulk of Meta's billions of dollars in annual revenue comes from advertising—a practice in which Meta actively participates through the use of algorithms that connect ads to specific users.

41.    Over the last decade, Meta has become one of the largest and fastest growing online advertisers in the world.  Since its creation in 2004, Meta's daily, monthly, and annual user base has grown exponentially to billions of users.

42.    Meta's advertising business has been successful due, in significant part, to Meta's ability to target consumers, both based on information users provide to Meta and other information about users Meta extracts from the internet at large.  Given the highly specific data used to target particular users, thousands of companies and individuals utilize Meta's advertising services.

43.    One of Meta's most powerful advertising tools is the Meta Pixel (formerly the Facebook Pixel), which it first launched in 2015.

44.    Meta branded Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."  Meta further stated:

> Facebook pixel, [is] a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website.  We're also announcing the availability of custom conversions, a new rule-based method to track and report conversions for your Facebook ads.
>
> Facebook pixel makes things simple for advertisers by combining the functionality of the Conversion Tracking pixels and Custom Audience pixels into a single pixel.  You only need to place a single pixel across your entire website to report and optimize for conversions.  Since it is built on top of the upgraded Custom Audience pixel, all the features announced in our previous blog post (Announcing Upgrades to Conversion Tracking and Optimization at Facebook) are supported through Facebook pixel as well.
>
> [Advertisers and website operators] can use Facebook pixel to track and optimize for conversions by adding standard events (e.g., Purchase) to your Facebook pixel base code on appropriate pages (e.g., purchase confirmation page).[17]

---

[17]    Cecile    Ho,    Announcing    Facebook    Pixel,    Meta    (Oct.    14,    2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

45. Pixel is a publicly available piece of code that Meta makes available to web developers for free. Website developers can choose to install and use Pixel on their websites to track and measure certain actions by website visitors. When a website visitor takes an action a developer chooses to track on their website, the Pixel is triggered and sends data about that "Event" to Meta. All of this happens without the user's knowledge or consent.

46. Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

47. Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

48. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

   a. HTTP Request: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies. POST Requests can send a large amount of data outside of the URL (for instance, uploading a PDF for filing a motion to a court).

   b. Cookies: a small text file that can be used to store information on the client device that can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

c.  HTTP Response: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

49.   An individual's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as the "Doctors" page). The HTTP Response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the individual's screen as they navigate Defendant's Website.

50.   Every website is composed of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

51.   Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.  Defendant embedded Pixel in its source code for that very purpose.

52.   By secretly recording and transmitting data to Meta—without the user's knowledge or consent—Pixel acts much like a traditional wiretap controlled by Defendant. When individuals visit TMC Health's website via an HTTP Request to Defendant's server, the server sends an HTTP Response including the Markup that displays the webpage visible to the user along with the invisible Source Code that includes the Pixel.  At that point, Defendant, in essence, hands individuals visiting its Website a tapped device. Once the webpage is loaded into the individual's browser, Pixel quietly waits for private user communications on the webpage to trigger the code-based wiretap.  Pixel then intercepts those communications intended only for Defendant and transmits the communications to Meta.

53.    The data intercepted by Pixel is also linked to a specific IP address,[18] which Meta may use in combination with other cookies and tracking technologies to associate the web activity to a specific Facebook user.[19]

54.    Meta does this by placing cookies in the web browsers of users logged into their services. The "c_user" cookie, for example, contains a numerical value known as the Facebook ID, which uniquely identifies a Facebook user.  When a Facebook user visits the Defendant's Website while logged-in to their Facebook account, Pixel transmits the user's private web communications with the Defendant along with the "c_user" cookie.  Meta can then use this information to match the web communications with the user's Facebook ID.

55.    Even if a user does not have a Facebook account or is not logged-in to Facebook when browsing the Defendant's Website, Pixel transmits the user's web communications with Defendant's Website to Meta along with a unique identifier associated with another cookie called the "_fbp" cookie.  Meta can then use that unique identifier, along with other persistent cookies, to link the user's web communications with the user's Facebook ID.  And if a user who does not have a Facebook account later creates an account, Meta may be able to associate the user's historical browsing history intercepted via the Pixel and "_fbp" cookie to the newly created account.

56.    Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its Source Code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to Meta. Meta then uses the information transmitted by Pixel to match the user with their Facebook ID.

57.    Judge William H. Orrick on the U.S. District Court for the Northern District of California summarized how this process plays out:

To understand how the Meta Pixel typically works, imagine the following

---

[18]    https://developers.facebook.com/docs/meta-pixel

[19]    https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites ("The Meta Pixel sends information to Facebook via scripts running in a person's internet browser, so each data packet comes labeled with an IP address that can be used in combination with other data to identify an individual or household.").

scenario. A shoe company wishes to gather certain information on customers and potential customers who visit its website. The shoe company first agrees to Meta's Business Tools Terms (discussed below), which govern the use of data from the Pixel. The shoe company then customizes the Meta Pixel to track, say, every time a site visitor clicks on the "sale" button on its website, which is called an "Event." Every time a user accesses the website and clicks on the "sale" button (i.e., an "Event" occurs), it triggers the Meta Pixel, which then sends certain data to Meta. Meta will attempt to match the customer data that it receives to Meta users—Meta cannot match non-Meta users. The shoe company may then choose to create "Custom Audiences" (i.e., all of the customers and potential customers who clicked on the "sale" button) who will receive targeted ads on Facebook, Instagram, and publishers within Meta's Audience Network. Meta may also provide the shoe company with de-identified, aggregated information so the shoe company understands the impact of its ads by measuring what happens when people see them. Meta does not reveal the identity of the matched Meta users to the shoe company.

*In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *2 (N.D. Cal. Dec. 22, 2022) (internal citations omitted).[20]

58.    It is one thing for a retail business to use Pixel to track web activity in the regular course of commercial activity.  But in this case, Defendant, a healthcare provider, employed Pixel to intercept, duplicate, and re-direct Plaintiffs' and Class Members' sensitive health information to Meta.

59.    The following is an example of how Pixel works on Defendant's Website. When an individual visits https://www.tmcaz.com and navigates to the "symptoms" page, the user can select a wide variety of symptoms related to sensitive medical conditions, including "unexplained weight loss."  Clicking on the "unexplained weight loss" option takes the user to the following webpage:

---

[20]    In describing Pixel technology in *In re Meta Pixel Healthcare Litig.*, the court referenced the declaration of expert Richard M. Smith, which provides further details on the manner in which the challenged Pixel technology works and Meta's arrangements with health providers that employ it. 2022 WL 17869218, at *2.  *See* Declaration of Richard M. Smith, filed in *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO (N.D. Cal.) [ECF 49].



60.     Because Defendant's Website has the Pixel embedded, the user's activity visiting the "unexplained weight loss" webpage is intercepted and transmitted to Facebook along with (1) the "c_user" cookie that identifies the user based on their unique Facebook ID, and/or (2) the unique identifier associated with the "_fbp" cookie that, in the event the user is not logged-in to Facebook, Meta can use to match with the user's actual Facebook ID.

61.     A visitor to the TMC Health website could then be retargeted with advertising on one of Meta's platforms, Facebook or Instagram. For example, according to the Facebook Ad Library, TMC Health has recently run the following ads apparently targeted at individuals in need of maternity services, mammograms, or surgery:







62.    By deploying the Meta Pixel on its Website for its intended purpose—tracking and disclosing website activities and retargeting identified individuals with advertising—TMC Health knew that patient health information would be disclosed to Meta.

63.    Plaintiffs and the Class Members never consented, authorized, or otherwise permitted Defendant to disclose their personally identifiable and protected health information to Meta.  Plaintiffs were not provided with any prior written notice that Defendant disclosed their Sensitive Information, nor were they provided any means of opting out of such disclosures. Even so, Defendant knowingly and intentionally disclosed Plaintiffs' and the Class Members' protected and private information via the Meta Pixel.

**D.    LinkedIn Insight Tag**

64.    LinkedIn is the largest social media platform geared specifically to professionals. LinkedIn boasts a membership of approximately 980 million users in more than 200 countries and territories worldwide.[21]  Its mission is to "connect the world's professionals to make them more productive and successful."[22]  Microsoft acquired LinkedIn in 2016 for $26.2 billion.[23]

65.    Like Meta, LinkedIn generates substantial revenue through its advertising program, bringing in more than $3 billion in revenue in 2021.[24]  For companies looking to advertise, LinkedIn pitches its ability to "[r]each the right audience," through "[p]recise and powerful audience targeting."[25]  This allows companies and advertisers to "[t]arget [their] ideal customer based on traits like their job title, company name or industry, and by professional or personal interests."[26]

---

[21]    https://about.linkedin.com/?trk=homepage-basic_directory_aboutUrl

[22]    *Id.*

[23]    https://www.nytimes.com/2016/06/14/business/dealbook/microsoft-to-buy-linkedin-for-26-2-billion.html

[24]    https://www.cnbc.com/2021/04/27/microsoft-linkedin-topped-3-billion-in-ad-revenue-in-last-year.html

[25]    https://business.linkedin.com/marketing-solutions/ad-targeting

[26]    *Id.*

66.    Like Meta, LinkedIn's ability to provide advertisers with precise target audiences comes from information users provide to LinkedIn as well as information LinkedIn learns about its users using online tracking technology.

67.    One of LinkedIn's online tracking tools is the LinkedIn Insight Tag. According to LinkedIn, "[t]he LinkedIn Insight Tag is a piece of lightweight JavaScript code that [companies] can add to [their] website to enable in-depth campaign reporting and unlock valuable insights about [their] website visitors."[27]  The LinkedIn Insight Tag can be used to "track conversions, retarget website visitors, and unlock additional insights about members interacting with [] ads."[28]

68.    Like the Meta Pixel, the LinkedIn Insight Tag "enables the collection of data regarding members' visits to [a] website, including the URL, referrer, IP address, device and browser characteristics (User Agent), and timestamp."[29]  The LinkedIn Insight Tag also transmits various cookies and unique identifiers to LinkedIn that allow LinkedIn to match the user's activity on the website to the user's LinkedIn account.[30]  And if the user does not have a LinkedIn account, the data still includes unique identifiers, such as the user's IP address and device and browser characteristics.[31]

69.    The following are examples of how the LinkedIn Insight Tag is used to disclose Sensitive Information on Defendant's Website. If a user types the word "depression" into the "search" bar on Defendant's Website, the following page is displayed:

---

[27]    https://www.linkedin.com/help/lms/answer/a427660

[28]    What data does my website send through this tag and how is it used? https://www.linkedin.com/help/lms/answer/a427660

[29]    *Id.*

[30]    *See id.*

[31]    *See id.*

20



70.     Because Defendant uses the LinkedIn Insight Tag on its Website, this information is intercepted and disclosed to LinkedIn, along with several cookies that LinkedIn can use to identify the specific user based on their LinkedIn account:



71.     The "path" reflects the URL information that is transmitted to LinkedIn, including that the user searched for the word, "depression."   LinkedIn also receives a cookie called "UserMatchHistory," which, according to LinkedIn's website, is used for "LinkedIn Ads ID

syncing."[32]   The LinkedIn Insight Tag also transmits two other cookies, "lms_ads" and "lms_analytics," which are used "to identify LinkedIn Members off LinkedIn for advertising," and "to identify LinkedIn Members off LinkedIn for analytics," respectively.[33]   Using this information, LinkedIn is able to associate the user's search for "depression" with the user's specific LinkedIn account for purposes of future targeted advertising.

72.    As another example, if a user of Defendant's Website navigates to the "Find a Provider" page and searches for doctors based on the specialty of "Psychiatry," the Website displays the following page:



73.    Unbeknownst to the user of Defendant's Website, the LinkedIn Insight Tag intercepts and discloses the same information to LinkedIn, along with unique identifiers that LinkedIn can use to match the user activity to a specific LinkedIn account:

---

[32]    https://www.linkedin.com/legal/l/cookie-table

[33]    *Id.*

74.    The Website's landing page has a drop-down menu of options, including "request my medical records."  If a user clicks on that option, the LinkedIn Insight Tag intercepts and discloses that information to LinkedIn along with the user's unique identifiers:

23



75.     By deploying the LinkedIn Insight Tag on its Website for its intended purpose—tracking and disclosing website activities and retargeting identified individuals with advertising—TMC Health knew that patient health information would be disclosed to LinkedIn.

76.     Plaintiffs and the Class Members never consented, authorized, or otherwise permitted Defendant to disclose their personally identifiable and protected health information to LinkedIn.  Plaintiffs were not provided with any prior written notice that Defendant disclosed their Sensitive Information, nor were they provided any means of opting out of such disclosures. Even so, Defendant knowingly and intentionally disclosed Plaintiffs' and the Class Members' protected and private information via the LinkedIn Insight Tag.

**E.     Snap Pixel**

77.     Snapchat is another social media company that has over 750 million users, including approximately 150 million in the U.S.[34]  Like Meta and LinkedIn, Snapchat generates substantial revenue by selling advertising on its platform.   In 2022, Snapchat generated approximately $4.6 billion in revenue, with roughly 99 percent coming from advertising.[35]

78.     Like Meta and LinkedIn, Snapchat sells its ability to create "custom audiences" and directly target consumers who are most apt to buy goods or services from the companies advertising on Snapchat's platform.[36]  One of the technologies Snapchat uses to effectively target ads is the Snap Pixel, "a tool that helps advertisers measure results, optimize audience targeting, and build audiences for their ad campaigns."[37]

79.     The Snap Pixel is a free piece of code that companies can install on their websites to track their customers' online activities.  The Snap Pixel "can track a variety of actions on [a]

---

[34]     https://techcrunch.com/2023/02/16/snapchat-announces-750-million-monthly-active-users/

[35]     https://www.investopedia.com/articles/investing/061915/how-snapchat-makes-money.asp

[36]     https://forbusiness.snapchat.com/advertising/targeting

[37]     https://forbusiness.snapchat.com/advertising/snap-pixel

website, such as page views, add-to-cart actions, purchases, and sign-ups."[38]  This user data then allows companies to "create Pixel Custom Audiences to reach people who've already engaged with [the] business" or to "create Lookalike Audiences to reach people who are similar to [] current customers."[39]

80.    The Snap Pixel transmits the user's interactions with the website along with various identifiers and cookies that Snapchat then uses to link the user to a Snapchat account.[40]

81.    The following is an example of how Defendant uses the Snap Pixel on its Website. The Website's landing page has an icon called "Classes and Events."  If a user clicks on that icon, the user can search for a variety of classes and events on specific healthcare topics, such as "Healthy Pregnancy."  By selecting the "Healthy Pregnancy" class, and clicking "Submit," the Website displays the following page:



82.    Unbeknownst to the user, the Snap Pixel intercepts, records, and transmits to Snapchat the specific page URL visited, to include the name of the class, "Healthy Pregnancy," along with cookies and other identifiers to link the search to a Snapchat account for purposes of future targeted advertising.

---

[38]    https://forbusiness.snapchat.com/advertising/snap-pixel

[39]    *Id.*

[40]    https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US

83.     As another example, the Website's landing page lists along the top of the page various options, including, "Pay My Bill."  If a user clicks on that option to pay his or her medical bill at TMC Health, the Snap Pixel intercepts, records, and transmits that information to Snapchat along with unique identifiers used to link the activity to a specific Snapchat account:





84.     By deploying the Snap Pixel on its Website for its intended purpose—tracking and disclosing website activities and retargeting identified individuals with advertising—TMC Health knew that patient health information would be disclosed to Snapchat.

85.     Plaintiffs and the Class Members never consented, authorized, or otherwise permitted Defendant to disclose their personally identifiable and protected health information to

Snapchat. Plaintiffs were not provided with any prior written notice that Defendant disclosed their Sensitive Information, nor were they provided any means of opting out of such disclosures. Even so, Defendant knowingly and intentionally disclosed Plaintiffs' and the Class Members' protected and private information via the Snap Pixel.

### F.    Google Tracking Code

86.    Like the Meta Pixel, LinkedIn Insight Tag, and Snap Pixel, Google creates code that website developers can install on their websites to track user activity. Whenever a user visits a website that is running Google tracking code, Google's code directs the user's browser to send a separate and concurrent communication to Google without the user's knowledge.

87.    The information that is intercepted and transmitted to Google via the Google tracking code includes: the URL of the specific webpage the user is trying to access; the user's IP address; the User-agent, which identifies the user's device platform and browser; the user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site. In this way, Google tracking code tells Google exactly what a user's browser communicated to the website.

88.    Like with the other social media companies, the user's communications to the website are transmitted to Google together with cookies and other unique identifiers that Google can use to match the communications to individuals who use Google's services.

89.    As an example of how the Google tracking code operates on TMC Health's website, consider a person who types "pregnancy" into the Website's search bar. By communicating that information to Defendant's Website, the Google tracking code simultaneously intercepts and transmits the communication regarding "pregnancy" to Google

28

for future retargeting and analytics purposes, as reflected below.  Indeed, one of the cookies transmitted to Google, the "IDE" cookie, is specifically for advertising.[41]



90.     The Google tracking code also intercepts when a patient navigates to one of the TMC Health webpages to log in to the patient portal, as reflected below:



[41]     https://business.safety.google/adscookies/

29



91.    Individuals who visit the TMC Health Website can then be retargeted with ads related to specific health conditions, as reflected by actual Google ads recently used by TMC Health, reflected below:



92.     By deploying the Google tracking code on its Website for its intended purpose—tracking and disclosing website activities and retargeting identified individuals with advertising—TMC Health knew that patient health information would be disclosed to Google.

93.     Plaintiffs and the Class Members never consented, authorized, or otherwise permitted Defendant to disclose their personally identifiable and protected health information to Google.  Plaintiffs were not provided with any prior written notice that Defendant disclosed their Sensitive Information, nor were they provided any means of opting out of such disclosures. Even so, Defendant knowingly and intentionally disclosed Plaintiffs' and the Class Members' protected and private information via the Google tracking code.

**G.     Exposure of Sensitive Information Creates a Substantial Risk of Harm**

94.     The Federal Trade Commission ("FTC") has recognized that consumer data is a lucrative (and valuable) form of currency.  In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable.  Data is currency."[42]

95.     The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business.  According to the FTC, reasonable data security protocols require, among other things: (1) using industry tested and accepted methods; (2) monitoring activity on networks to uncover unapproved activity; (3) verifying that privacy and security features function properly; and (4) testing for common vulnerabilities or unauthorized disclosures.[43]

---

[42]     Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009) (last visited Oct. 29, 2024) https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf

[43]     *Start With Security, A Guide for Business,* FTC (last visited Oct. 29, 2024) https://www.ftc.gov/business-guidance/resources/start-security-guide-business

31

96.     The FTC cautions businesses that failure to protect Sensitive Information and the resulting privacy breaches can destroy consumers' finances, credit history, and reputations, and can take time, money and patience to resolve the effect.[44]  Indeed, the FTC treats the failure to implement reasonable and adequate data security measures as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

**H.     Plaintiffs' and the Class's Sensitive Information is Valuable**

97.     The personal and health information of Plaintiffs and the Class is valuable and has become a highly desirable commodity.  Indeed, one of the world's most valuable resources is the exchange of personal data.[45]

98.     Business News Daily reported that businesses collect personal data (i.e., gender, web browser cookies, IP addresses, and device IDs), engagement data (i.e., consumer interaction with a business's website, applications, and emails), behavioral data (i.e., customers' purchase histories and product usage information), and attitudinal data (i.e., consumer satisfaction data) from consumers.[46]  Companies then use this data to impact the customer experiences, modify their marketing strategies, publicly disclose or sell data, and even to obtain more sensitive data that may be even more lucrative.[47]

99.     The power to capture and use customer data to manipulate products, solutions, and the buying experience is invaluable to a business's success.  Research shows that organizations

---

[44]    *See* Taking Charge, What to Do if Your Identity is Stolen, FTC, at 3 (2012) (last visited Oct. 29, 2024), https://www.myoccu.org/sites/default/files/pdf/taking-charge-1.pdf

[45]    *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data

[46]    Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, BUSINESS NEWS DAILY (Aug. 5, 2022; updated Aug. 25, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html

[47]    *Id.*

who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[48]

100.    In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[49]    In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[50]

101.    OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e., $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record.  A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[51]

102.    Unlike financial information, such as credit card and bank account numbers, PHI and certain PII cannot be easily changed.  Dates of birth and social security numbers are given at birth and attach to a person for the duration of his or her life.  Medical histories are inflexible. For these reasons, these types of information are the most lucrative and valuable.[52]

103.    Consumers place a considerable value on their Sensitive Information and the privacy of that information.  One 2002 study determined that U.S. consumers highly value a website's protection against improper access to their Sensitive Information, between $11.33 and

---

[48]    Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, MCKINSEY (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[49]    Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220, OECD PUBLISHING PARIS, (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[50]    *Id.* at 25.

[51]    *Id.*

[52]    *Calculating the Value of a Privacy Breach – What Are the Most Valuable Files to a Hacker?* Donnellon McCarthy Enters, https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/ (last visited Oct. 29, 2024).

$16.58 per website. The study further concluded that to U.S. consumers, the collective "protection against error, improper access, and secondary use of personal information is worth between $30.49 and $44.62.[53] This data is approximately twenty years old, and the dollar amounts would likely be exponentially higher today.

104. Defendant's privacy violations exposed a variety of Class Members' Sensitive Information, including medical conditions, symptoms, treatments sought, physicians, search queries, patient status, and other highly sensitive data.

105. Some industry insiders and journalists are even calling hospitals the "brokers to technology companies" for their role in data sharing in the $3 trillion healthcare sector.[54] "Rapid digitization of health records … have positioned hospitals as a primary arbiter of how much sensitive data is shared."[55]

106. Third-party technology companies, like Meta, LinkedIn, Snapchat, and Google, generate a substantial portion of their revenue through highly targeted advertising—a valuable service that is enabled by entities like Defendant sharing information about their users' online activities. Entities, like Defendant, likewise benefit financially from the collection and sharing of user data by increasing sales or customer acquisitions while also reducing advertising costs.[56]

107. A robust marketplace exists for users' online browsing data, and multiple companies pay users for the privilege to collect device usage data, browsing histories, and more.[57]

---

[53] 11-Horn Hann, Kai-Lung Hui, *et al*, *The Value of Online Information Privacy: Evidence from the USA and Singapore,* at 17. Marshall Sch. Bus., Univ. So. Cal. (Oct. 2002), https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited Oct. 29, 2024).

[54] Melanie Evans, *Hospitals Give Tech Giants Access to Detailed Medical Records*, The Wall Street Journal, (Jan. 20, 2020), https://www.wsj.com/articles/hospitals-give-tech-giants-access-to-detailed-medical-records-11579516200.

[55] *Id.*

[56] *See* Meta Pixel Case Studies, https://www.facebook.com/business/tools/meta-pixel/case-studies (last visited Oct. 29, 2024)

[57] https://millennialmoneyman.com/get-paid-for-your-data/

108.   Through Defendant's conduct described herein, Plaintiffs and the Class were injured and lost the benefit and financial value of their private data, while Defendant unjustly benefitted.

I.   **Plaintiffs and the Class Had a Reasonable Expectation of Privacy in Their Interaction with Defendant's Website**

109.   Consumers are concerned about entities, like Defendant, collecting their data and assume the data they provide, particularly highly sensitive medical data, will be kept secure and private.

110.   In a recent survey related to internet user expectations, most website visitors stated they assume their detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[58]  As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[59]

111.   The majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its' customers' data.[60]  A March 2000 BusinessWeek/Harris Poll found that 89% of respondents were uncomfortable with web tracking schemes where data was combined with an individual's identity.[61]  The same poll found that 63% of respondents were uncomfortable with web tracking even where the clickstream data was not linked to personally identifiable information.[62]  A July

---

[58]   *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.

[59]   Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, THE INFORMATION SOCIETY, 38:4, 257, 258 (2022).

[60]   *Public Opinion on Privacy*, EPIC.ORG, https://archive.epic.org/privacy/survey/.

[61]   *Id.*

[62]   *Id.*

2000 USA Weekend Poll showed that 65% of respondents thought that tracking computer use was an invasion of privacy.[63]

112.    Patients and website users act consistently with their expectation of privacy.  For example, following a new rollout of iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[64]

113.    Like the greater population, Defendant's patients would expect the highly sensitive *medical* information they provided to Defendant through its Website to be kept secure and private.

## CLASS PERIOD

114.    For purposes of this Class Action Complaint, the Class Period corresponds to the period between September 2021 and the present and runs until such date as the Court enters an Order certifying the case for class action treatment.

## CLASS ALLEGATIONS

115.    Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated, as representatives of the following Class:

> All patients of TMC Health whose Sensitive Information was disclosed to a third-party through Defendant's Website without authorization or consent during the Class Period.

116.    Excluded from the Class are Defendant; officers, directors, and employees of Defendant; any entity in which Defendant has a controlling interest in, is a parent or subsidiary of, or which is otherwise controlled by Defendant; and Defendant's affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assignees.  Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

---

[63]    *Id.*

[64]    Margaret Taylor, *How Apple screwed Facebook*, WIRED, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

117. Plaintiffs reserve the right to modify and/or amend the Class definition as necessary.

118. All members of the proposed Class are readily identifiable through Defendant's records.

119. All requirements for class certification under Fed.R.Civ.P. 23(a), 23(b)(2) and 23(b)(3) are satisfied.

120. **Numerosity.** The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiffs are informed and believe that the proposed Class includes a population of residents of approximately one million people. The precise number of Class Members is unknown to Plaintiffs but may be ascertained from Defendant's records.

121. **Commonality and Predominance.** This action involves common questions of law and fact to the Plaintiffs and Class Members, which predominate over any questions only affecting individual Class Members. These common legal and factual questions include, without limitation:

a. Whether Plaintiffs' and Class Members' communications with Defendant's Website were unlawfully intercepted and disclosed to third parties;

b. Whether Defendant acted with a criminal or tortious purpose in intercepting Plaintiffs' and Class Members' communications;

c. Whether Plaintiffs and Class Members consented to the disclosure;

d. Whether Plaintiffs and the Class are entitled to recover damages; and

e. Whether Plaintiffs and the Class are entitled to other appropriate remedies including injunctive relief.

122. Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiffs on behalf of themselves and the Class. Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.

37

123.    **Typicality.**  Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Information, like that of every other Class member, was improperly disclosed by Defendant.  Defendant's misconduct impacted all Class Members in a similar manner.

124.    **Adequacy.**  Plaintiffs will fairly and adequately represent and protect the interest of the members of the Class and have retained counsel experienced in complex consumer class action litigation and intend to prosecute this action vigorously.  Plaintiffs have no adverse or antagonistic interests to those of the Class.

125.    **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant.  The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims.  There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court.  Absent a class action, individual patients like Plaintiffs would find the cost of litigating their claims prohibitively high and would have no effective remedy for monetary relief.

126.    Class Certification under Fed.R.Civ.P. 23(b)(2) is also appropriate.  Defendant has acted or refused to act on grounds that apply generally to the Class, thereby making monetary, injunctive, equitable, declaratory, or a combination of such relief appropriate. As Defendant continues to engage in the practices described herein, the risk of future harm to Plaintiffs and the Class remains, making injunctive relief appropriate. The prosecution of separate actions by all affected individuals with dealings and contracts similar to Plaintiffs', even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to individual patients, which would establish potentially incompatible standards of conduct for Defendant, and/or (b) adjudications with respect to individual patients which would, as a practical matter, be dispositive of the interests of the other patients not parties to the adjudications, or which

38

would substantially impair or impede the ability to protect the interests of the Class. Further, the claims of individual patients in the defined Class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

**CLAIM**

**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT**

**("ECPA") 18 U.S.C. § 2511(1), *et seq.***

127.    Plaintiffs re-allege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

128.    The primary purpose of ECPA is to protect the privacy of communications.

129.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of ECPA.

130.    Electronic Communications. The transmission of PII and PHI between Plaintiffs and Class Members and Defendant's Website are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

131.    Content. ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

132.    Interception. ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

133.    Electronical, Mechanical, or Other Device. ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

134.    The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.    Plaintiffs' and Class Members' browsers;

b. Plaintiffs' and Class Members' computing devices;

c. Defendant's web-servers; and,

d. The Tracking Technology code deployed by Defendant to effectuate acquiring and disclosing patient communications.

135. By deploying the Tracking Technologies on its Website, Defendant intentionally intercepted the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a). The intercepted communications included the content of substantive communications from Plaintiffs and Class Members to Defendant regarding Sensitive Information, including medical symptoms, conditions, treatments, and physicians.

136. Crime/Tort Exception. Defendant intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing tortious or criminal acts in violation of the Constitution or laws of the United States or of any State. Specifically, TMC Health intercepted or acquired the contents of its patients' communications for the purpose of disclosing those communications to third-party AdTech companies for ad retargeting in violation of HIPAA.

137. 42 U.S.C. § 1320d-6 of HIPAA provides criminal penalties against a healthcare provider that "knowingly . . . discloses individually identifiable health information to another person" without authorization.

138. 42 U.S.C. § 1320d(6) of HIPAA defines individually identifiable health information as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and—(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d(6).

139. The express purpose of the Tracking Technologies is to disclose a website visitor's activities on a website, identify that individual, and retarget that individual with advertising

40

based on the user's website activities. By secretly deploying the Tracking Technologies on its Website, TMC Health acted with the purpose of knowingly disclosing individually identifiable health information without patient authorization in violation of HIPAA.

140. First, the communications intercepted by the Tracking Technologies were received "by a health care provider," TMC Health. Second, the communications "relate[d] to the past, present, or future physical or mental health or condition of an individual, the provision of healthcare to an individual, or the past, present, or future payment for the provision of healthcare to an individual." The Tracking Technologies disclosed Plaintiffs' substantive health information when Plaintiffs searched for specific symptoms, conditions, treatments, and physicians; when they paid medical bills; and when they engaged in other activities that "relates to the past, present, or future physical or mental health or condition of an individual." Third, the information disclosed via the Tracking Technologies "identifi[ed] the individual" or "with respect to which there [was] a reasonable basis to believe that the information [could] be used to identify the individual." The identifying information disclosed via the Tracking Technologies included cookies and other unique identifiers the AdTech companies could use to identify TMC Health patients by name and retarget them with advertising.

141. Because Plaintiffs were patients of TMC Health when they communicated substantive health information through the Website, and the Tracking Technologies disclosed that information to the third-party AdTech companies along with Plaintiffs' unique identifiers, TMC Health necessarily disclosed individually identifiable health information of patients. Further, given TMC Health's representations regarding the privacy and security of health information communicated via the Website, and the lack of any disclosure concerning the use of the Tracking Technologies, the disclosure of Plaintiffs' information was without authorization or consent.

142. The purpose of TMC Health's interception of Plaintiffs' communications—the intended use—was to engage in conduct that violated a criminal provision of HIPAA. Thus, TMC Health cannot claim immunity under ECPA's party exception.

143. Defendant was not acting under color of law to intercept Plaintiffs' and the Class Members' electronic communications.

144. A person who violates § 2511(1)(a) is liable for $10,000 in statutory damages to any person whose wire, oral, or electronic communications are unlawfully intercepted. Because TMC Health intercepted Plaintiffs' and Class Members' communications for a purpose that was criminal and/or tortious, the interceptions were unlawful, and Plaintiffs are entitled to all available statutory penalties under ECPA.

145. Based on the foregoing, Plaintiffs and Class Members seek all other relief as the Court may deem just and proper, including all available monetary relief, injunctive and declaratory relief, any applicable penalties, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment in their favor on all Counts as follows:

a. Certification of the Class pursuant to the provisions of Fed. R. Civ. P. 23 and an order that notice be provided to all Class Members;

b. Designation of Plaintiffs as representatives of the Class and the undersigned counsel as Class Counsel;

c. An award of damages or other monetary relief in an amount to be determined at trial or by this Court;

d. An order for injunctive relief, enjoining Defendant from engaging in the wrongful and unlawful acts described herein;

e. An order for declaratory relief as may be appropriate;

f. An award of statutory interest and penalties;

g. An award of costs and attorneys' fees; and

h. Such other relief the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully submitted,

ZIMMERMAN REED LLP

Dated: October 29, 2024      By:   /s/ Ryan J. Ellersick
        Hart L. Robinovitch (AZ #020910)
        Ryan J. Ellersick (AZ #038805)
        14648 N. Scottsdale Road, Suite 130
        Scottsdale, AZ 85254
        Telephone: (480) 348-6400
        hart.robinovitch@zimmreed.com
        ryan.ellersick@zimmreed.com

*Attorneys for Plaintiffs*